THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DOROTHY L. GRICE, Defendant-Appellant.

Second District   No. 79-50

Opinion filed August 20, 1980.

Mary Robinson, of State Appellate Defender's Office, of Elgin, and Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Dallas C. Ingemunson, State's Attorney, of Yorkville (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE VAN DEUSEN delivered the opinion of the court:

On February 8, 1978, the defendant, Dorothy L. Grice, and two companions were charged by indictment with the offense of retail theft in excess of $150 (Ill. Rev. Stat. 1977, ch. 38, par. 16A—3(a)). After a jury trial, the defendant was convicted of the crime charged; the trial court entered judgment of conviction and sentenced her to 30 months' probation and 90 days' periodic imprisonment. A codefendant pleaded guilty to the charge, and the State nol prossed the charge against the third indictee. This appeal concerns only the defendant, Dorothy L. Grice.

The basic facts necessary for a resolution of this matter on appeal are not in dispute. On November 8, 1977, at approximately 7 p.m. three black women, one of whom was the defendant, entered the Jean Shack, a retail clothing establishment located in Countryside Shopping Center in Yorkville, Illinois, and began to look at merchandise, including certain leather coats situated on a spiral rack in front of the store's cash register and counter. The women walked throughout the store talking and whispering among themselves and returned to this particular rack of leather coats three or four times. Sherri Wiertz, a salesclerk, was the sole employee working in the store on the evening in question. The defendant approached the salesclerk and asked her about a specific outfit, consisting of a vest and matching pair of jeans, which was located in a corner of the store. The salesclerk accompanied the defendant to the corner of the store where the particular outfit was located.

While in the corner of the store, the clerk was unable to observe the coat rack where the leather coats were located due to the fact that her view was blocked by the positioning of the store's dressing rooms. The defendant tried on the vest, looked at the pants without trying them on and indicated that she desired to purchase the matching outfit. At this point the clerk heard the door open and close due to the sound of the bell located on the door, which provided the only useable entrance to the store. The salesclerk did not see anyone enter the store, so she figured that the defendant's companions had just left. The defendant and the store employee proceeded to the counter at the front of the store where the defendant paid $30 for the vest and pants; the defendant then departed the Jean Shack. Although four individuals accompanied by a baby entered the store for a brief period immediately prior to the defendant's departure, they stayed for less than a minute, did not approach the coat rack where the particular leather coats were located and did not leave the store with any Jean Shack merchandise. A few seconds later the clerk began to close up for the evening at which time she noticed that three leather coats were missing from the spiral coat rack; later she discovered two others were also missing. She immediately attempted to call the police and believed she was connected with the Kendall County sheriff's

department. She gave the police a description of the defendant and her companions over the telephone, including their height, weight, kind of clothing, race and sex, and she repeated the descriptions to Yorkville police officer Jeff Ross when he arrived at the scene. The salesclerk also testified that the leather coats were on the rack prior to the time the defendant and her friends entered the clothing establishment. She also stated on cross-examination that the defendant did not act in a suspicious or criminal manner while she was in the store.

Police officer Alfred Kamp, a patrolman for the city of Plano, testified for the defendant under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60) at the hearing on the motion to suppress and for the State at trial. At approximately 7:30 p.m. on the evening in question, he was sitting in his patrol car at the east end of Plano running a radar speed detection device on highway 34, an east-west route connecting Yorkville and Plano. His location was approximately five to six miles west of the Countryside Shopping Center. At that time the officer received a dispatch over the radio which indicated that three black females had committed a robbery at the Jean Shack located in Countryside Shopping Center. Officer Kamp moved his car closer to the roadway and put his headlights on bright so he could see into passing vehicles. The officer had not seen any black females in Plano on the day in question and stated that there were no black residents in Plano, although he admitted that he had seen some blacks using highway 34 on past occasions.

Approximately two to six minutes after receiving the initial dispatch, Kamp observed a white Cadillac travelling westbound on highway 34; two black women were sitting in the front seat, while a third black individual, whose sex the officer could not determine at the moment, was seated in the back seat. He followed the car for approximately six blocks during which time he radioed for assistance and determined that the third individual was also female; he then turned on his overhead lights and stopped the vehicle. The officer testified that the three black women were not violating any law during the period he observed them. The defendant, who was driving the subject vehicle, exited the car and proceeded back towards the police car. She told Officer Kamp that she did not have a driver's license and that she was from Rock Island. He informed her that he needed to see some form of identification and that he would have to give her a ticket for driving without a driver's license. Kamp followed the defendant to the subject automobile, which the defendant had difficulty reentering because the door was locked. After one of the defendant's companions unlocked the door, Officer Kamp was able to observe certain items in plain view inside the vehicle due to the illumination provided by an interior light. He saw a green garbage bag on

the floorboard behind the driver's seat; the sleeve of a leather-like jacket was sticking out of the green bag and was lying over the transmission hump. The officer also observed a plastic bag on the front seat with the Jean Shack label on it and another bag of undetermined color situated on the floorboard in the right front passenger area of the vehicle.

Officer Kamp further testified that Sergeant Wagner of the Plano police department arrived at the scene, requested and received complete descriptions of the suspects over his radio and relayed the information to him. Kamp observed that the defendant and her companions matched the descriptions given to him by Wagner. Then Lieutenant Speenburgh of the Kendall County sheriff's department arrived, placed the three women under arrest, advised them of their rights and asked them to exit the vehicle. After the women exited the vehicle, one of them locked the car.

Officer Kamp remained with the subject vehicle until Officer Ross and Steven Heubel, the owner of the Jean Shack, arrived at the scene. The two officers and Heubel looked into the vehicle with the aid of a flashlight. Kamp testified the officers saw what appeared to be brown leather jackets on the floor in a sack and a green garbage bag on the front passenger floorboard. Ross stated he saw a Jean Shack bag on the front seat of the automobile and a bag on the back seat with items of leather sticking out, while Heubel saw a leather coat sleeve hanging out of a garbage bag which was located on the floorboard behind the driver's seat. Heubel also testified he could identify the coat which was partially visible by the manufacturer's label and the Jean Shack tag which were affixed to it.

Officer Ross then broke into the car by using a coat hanger to unlock the door. The police found five leather coats bearing Jean Shack identification and price tags in the garbage bag; no sales receipts accompanied the merchandise. Heubel identified the coats as property from his store and also observed a Jean Shack bag, which contained a pair of jeans and a denim vest along with a sales receipt, on the front seat of the car. After the coats were examined, they were left in the vehicle; the car was relocked and towed to a police impoundment lot in Yorkville. There the police conducted an inventory of the car's contents after Officer Ross had again opened the vehicle with a coat hanger. At the time of the inventory, the owner of the Jean Shack again identified the coats as Jean Shack merchandise. He stated that the total wholesale value of the coats was $350 to $375 and that the coats were very bulky, winter coats.

Prior to trial, the defendant filed a motion to suppress evidence which she claimed was illegally seized, contending that the stop of the automobile which she was driving was improper and that the resultant nonconsensual, warrantless arrest and search of the vehicle violated her State and Federal constitutional rights to be free from unreasonable

searches and seizures. On appeal, the defendant contends that since the initial stop of the vehicle was improper, the evidence seized thereafter should have been suppressed at trial and, consequently, this court should reverse her conviction.

At the hearing on the motion to suppress, the trial court determined that Officer Kamp had sufficient grounds to carry out an investigatory stop of the subject vehicle. The court based its decision on the following factors: (1) that the stop occurred on highway 34, the main arterial road linking the cities of Yorkville and Plano, approximately five miles from the scene of the crime; (2) that the stop occurred within five minutes after the Plano police received notice of a theft at the Jean Shack in Yorkville; and (3) that the general descriptions of the alleged perpetrators of the crime given to the officer matched those of the individuals riding in the subject vehicle, based solely on their number (three), their race (black) and their gender (female). After determining that the investigatory stop was lawful, the trial court found that the subsequent search of the automobile was justified on the ground that, since some of the items believed to have been taken in the theft were in plain view in the automobile, the police had probable cause to conduct a warrantless search of the vehicle.

With respect to a motion to suppress physical evidence, the burden of establishing that the search and seizure were unlawful rests on the defendant. (Ill. Rev. Stat. 1977, ch. 38, par. 114—12(b); *People v. Wright* (1969), 42 Ill. 2d 457, 460; *People v. Blakes* (1977), 55 Ill. App. 3d 654, 657; *People v. Berry* (1977), 54 Ill. App. 3d 647, 649.) Also, the reviewing court has the duty to affirm the result reached by the trial court on the motion to suppress evidence unless the lower court's ruling was manifestly erroneous. *People v. Williams* (1974), 57 Ill. 2d 239, 246, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506; *People v. Holloway* (1980), 82 Ill. App. 3d 703, 707; *People v. Stuckey* (1979), 78 Ill. App. 3d 1085, 1089.

It is well settled that a police officer, in appropriate circumstances and in an appropriate manner, may approach an individual for purposes of investigating possible criminal behavior even though there is no probable cause to arrest, provided, however, that the officer's decision to stop is based on specific and articulable facts which, when combined with rational inferences from those facts, reasonably warrant the investigative intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80; *People v. McMullen* (1980), 82 Ill. App. 3d 1042, 1047; *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 694-95; *People v. Jackson* (1979), 77 Ill. App. 3d 117, 122.) The court in *Terry v. Ohio* stated that in determining whether a stop is reasonable an objective standard is to be used, namely, whether the facts available to the officer

warrant a man of reasonable caution to believe that the action taken was appropriate. (392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; accord, *People v. Holdman* (1978), 73 Ill. 2d 213, 221, *cert. denied* (1979), 440 U.S. 938, 59 L. Ed. 2d 496, 99 S. Ct. 1285; *People v. Jackson* (1979), 77 Ill. App. 3d 117, 122.) But a mere suspicion or a hunch is not sufficient. *People v. Jackson* (1979), 77 Ill. App. 3d 117, 122; *People v. Crawford* (1978), 64 Ill. App. 3d 861, 864; see *People v. McGowan* (1977), 69 Ill. 2d 73, 77-78, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624.

■■ The constitutional rule established in *Terry v. Ohio* has been codified in section 107—14 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1977, ch. 38, par. 107—14; *People v. McGowan* (1977), 69 Ill. 2d 73, 76-77, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624; *People v. Schoepke* (1979), 77 Ill. App. 3d 1026, 1029.) The Illinois codification of the holding in *Terry* provides that a police officer, after having identified himself as such, may lawfully stop any person in a public place for a reasonable period of time when he reasonably infers from all the circumstances that the individual is about to commit or has committed an offense.

■■ At the time of the stop, the investigating officer was aware that three black females were being sought as suspects in connection with the retail theft that occurred at the Jean Shack, which was located five to six miles away in Yorkville; that Plano had no black residents and that black people seldom used the highway along which he was situated and which led directly from Yorkville to Plano; and that three black females passed his position within two to six minutes after he received a dispatch advising him that three black women were suspected of stealing merchandise from the Jean Shack in Countryside Shopping Center. We determine that the facts known to Officer Kamp prior to the stop of the subject vehicle warranted a man of reasonable caution to believe that the passengers of the vehicle had committed the theft at the Jean Shack. The officer had knowledge of sufficient, specific and articulable facts to justify the stop of the defendant's vehicle in order to maintain the *status quo* while he investigated for criminal activity. Cases such as *People v. Drummer* (1980), 81 Ill. App. 3d 626, *People v. Jodie* (1979), 79 Ill. App. 3d 348, and *People v. Moore* (1977), 55 Ill. App. 3d 706, when read together, indicate that a person's race or national origin can be a relevant factor where the area in which the crime has been committed is one which is generally not populated by persons of the particular racial group of which the suspect is a member and for the purpose of describing the suspect. Also, in a society so heavily dependent on transportation by automobile, it was not unreasonable for the investigating officer here to infer that the defendant and her companions would attempt to escape from the scene of the crime in an automobile (*People v. Drummer* (1980), 81 Ill. App. 3d 626, 629) and

would also make their departure via the main highway leading from the scene of the theft. Given the nature of automobile transportation, we do not believe that the five or six miles which separated the scene of the crime from the place of the stop were so remote in distance as to invalidate the stop, particularly since the investigatory stop was conducted within two to six minutes after the officer received the dispatch describing the suspects and indicating that they were suspected of having robbed the Jean Shack.

Since the initial investigatory stop was conducted in accordance with the rule announced in *Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80 and the Illinois codification of the *Terry* rule (Ill. Rev. Stat. 1977, ch. 38, par. 107—14), it is clear from the facts of this case that the subsequent warrantless arrest and search and seizure were also lawful. We conclude that the trial court correctly denied the defendant's motion to suppress evidence which she believed was illegally seized. The defendant has not met her burden of demonstrating that the stop and the resultant search and seizure were unlawful, and the trial court's ruling was not manifestly erroneous.

Initially, the defendant had contended that the indictment in this case was fatally defective, since it failed to allege either the name of the merchant or the corporate existence of the retail mercantile establishment. At oral argument, however, defense counsel advised the court that the defendant was withdrawing this issue from consideration in light of our supreme court's recent decision in *In re W. S., Jr.* (1980), 81 Ill. 2d 252. Accordingly, we do not address the question of the sufficiency of the charging instrument.

As her final assignment of error, the defendant contends that the State failed to prove beyond a reasonable doubt that she was legally accountable for the actions of her two companions who allegedly committed the offense of retail theft. She argues that her conduct on the evening in question was entirely innocent. The State does not argue that the defendant herself committed the theft; rather, its position is that the evidence establishes that a theft from a retail mercantile establishment occurred and the defendant is legally accountable for the conduct of the actual thieves.

Certain basic principles are well settled in the area of the law dealing with legal accountability. In order to establish the defendant's legal accountability for the offense of retail theft under section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c)), the State must prove beyond a reasonable doubt that the accused solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense, that such participation occurred either before or during the perpetration of the crime, and that this participation was

with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Ware* (1980), 82 Ill. App. 3d 297, 306; *People v. Dandridge* (1979), 79 Ill. App. 3d 693, 695; *People v. Ivy* (1979), 68 Ill. App. 3d 402, 404-05; see *People v. Tyler* (1979), 78 Ill. 2d 193, 196-97.) While mere presence at the scene of the crime is insufficient to establish legal accountability for commission of the offense, one may aid or abet without actively participating in the overt act. (*People v. Tyler* (1979), 78 Ill. 2d 193, 196-97; *People v. Nugara* (1968), 39 Ill. 2d 482, 487, *cert. denied* (1968), 393 U.S. 925, 21 L. Ed. 2d 261, 89 S. Ct. 257; *People v. Dandridge* (1979), 79 Ill. App. 3d 693, 695; *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 243; *People v. McConnell* (1977), 48 Ill. App. 3d 355, 361.) Words of agreement are not necessary to demonstrate a common purpose to perpetrate a crime, since the common design can be inferred from the circumstances surrounding the commission of the unlawful act. (*People v. Tate* (1976), 63 Ill. 2d 105, 109; *People v. Mertens* (1979), 77 Ill. App. 3d 791, 796; *People v. Hendrix* (1974), 18 Ill. App. 3d 838, 841.) Although it is true that legal accountability for a crime is based on the defendant's assistance before or during the commission of the criminal act, the defendant's conduct subsequent to the offense may raise an inference of prior or concurrent participation. *People v. Posey* (1980), 83 Ill. App. 3d 885, 890-91; *People v. Crutcher* (1979), 72 Ill. App. 3d 239, 244; *People v. Cox* (1979), 71 Ill. App. 3d 850, 857.

■■ While mere presence at the scene of the crime is not culpable and knowledge by the defendant that a crime was being committed does not constitute aiding or abetting (*People v. Owens* (1975), 32 Ill. App. 3d 893, 895; *People v. Tillman* (1971), 130 Ill. App. 2d 743, 750), proof that the accused was present during the commission of a crime without opposing or disapproving it, that she maintained a close affiliation with her companions after the perpetration of the offense and that she failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability. (*People v. Dandridge* (1979), 79 Ill. App. 3d 693, 695; *People v. Lopez* (1979), 72 Ill. App. 3d 713, 716; *People v. Cole* (1977), 50 Ill. App. 3d 133, 142, *cert. denied* (1978), 435 U.S. 944, 55 L. Ed. 2d 541, 98 S. Ct. 1526.) Where, as here, the defendant is convicted on the theory of legal accountability for the unlawful act of another based upon evidence which is entirely circumstantial, the facts proved must not only be consistent with the accused's guilt but must also be inconsistent with any reasonable hypothesis of innocence (*People v. Wright* (1976), 43 Ill. App. 3d 458, 460; *People v. Harris* (1975), 34 Ill. App. 3d 906, 908, *cert. denied* (1976), 429 U.S. 1002, 50 L. Ed. 2d 614, 97 S. Ct. 534), or the facts produced must so thoroughly establish the defendant's guilt as to exclude every reasonable hypothesis of innocence (*People v. Trapps* (1974), 22 Ill. App. 3d 1029,

1033). But the trier of fact is not required to search out various potential explanations compatible with innocence and raise them to the status of a reasonable doubt. (*People v. Wright* (1976), 43 Ill. App. 3d 458, 460-61; *People v. Harris* (1975), 34 Ill. App. 3d 906, 908.) In addition, the jury's determination that the defendant is legally accountable for the criminal act of another will not be set aside unless the evidence is so improbable, unsatisfactory or unreasonable as to warrant a reasonable doubt of the accused's guilt. *People v. Tate* (1976), 63 Ill. 2d 105, 108; *People v. Cox* (1979), 71 Ill. App. 3d 850, 857.

The parties do not dispute the facts of this case; rather, the controversy here concerns the inferences which are to be drawn from these facts. In light of the established legal principles set forth above and the facts and circumstances of this case, the jury could well have determined that the defendant engaged in a common scheme to commit the retail theft and aided or abetted her companions in the commission of the offense with the specific intent to promote or facilitate the perpetration of the crime. On the other hand, there is insufficient evidence in the record to show that the defendant has established a reasonable hypothesis of innocent behavior. Since the jury may draw inferences from the defendant's conduct (*People v. Tate* (1976), 63 Ill. 2d 105, 109; *People v. McClindon* (1973), 54 Ill. 2d 546, 551, *cert. denied* (1974), 415 U.S. 992, 39 L. Ed. 2d 889, 94 S. Ct. 1593), the jury here could have reasonably concluded that the defendant's conduct in the store and thereafter, the presence of the perpetrators of the crime in the car she was driving, and the large size or bulk of the stolen items and their location in the car were actions and circumstances which demonstrated that she was a participant in the crime rather than an innocent bystander.

The judgment and sentence entered by the circuit court for the Sixteenth Judicial Circuit, Kendall County, against the defendant, Dorothy L. Grice, in this cause is affirmed.

Affirmed.

WOODWARD and NASH, JJ., concur.