THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WILLIS *et al.*, Defendants-Appellants.

First District (1st Division) Nos. 1—89—0956, 1—89—1016, 1—89—2329 cons.

Opinion filed June 24, 1991.—Rehearing denied August 20, 1991.

912

Randolph N. Stone, Public Defender, of Chicago (Michaela J. Kalisiak and Robert Guch, Assistant Public Defenders, of counsel), for appellant Michael Willis.

Michael J. Pelletier and Anne E. Meyer, both of State Appellate Defender's Office, of Chicago, for appellant Marvin Kitchen.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Daniel Rabinovitz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal. Defendants, Michael Willis and Marvin Kitchen, were charged by indictment with the murder of Coy Lee Harris. Willis exercised his right to a jury trial; Kitchen waived his right to a jury trial. Although the trials were severed, Willis and Kitchen were tried simultaneously. At the conclusion of the trials, the jury entered a verdict of guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) as to Willis. The trial court entered judgment

on the jury's verdict and also entered judgment finding Kitchen guilty of first degree murder predicated on the theory of accountability. (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) Willis was sentenced to a prison term of 28 years, and Kitchen was sentenced to a term of 20 years. On appeal, defendant Willis contends that: (1) the State failed to prove beyond a reasonable doubt that he had not acted in self-defense; (2) the State's closing argument substantially prejudiced him and deprived him of his constitutional right to a fair trial; and (3) the trial court's improper modification of the jury instruction unfairly prejudiced the jury against him. Defendant Kitchen contends that: (1) the trial court erred in finding him guilty of first degree murder on an accountability theory; (2) section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—2) violates the due process and equal protection clauses of the Illinois and United States Constitutions, and violates the separation of powers requirement of the Illinois Constitution. For the following reasons, the judgments entered by the trial court are affirmed.

The record sets forth the following facts relevant to this appeal. In the late afternoon of December 26, 1987, Kitchen was visiting a friend in a fourth-floor apartment at 3739 S. Federal, Chicago, when Willis came to the friend's door looking for Kitchen. Willis asked the friend to tell Kitchen to come up to the ninth-floor apartment of Ruby Smith, Kitchen's aunt. Approximately 15 minutes later, Kitchen went to Smith's apartment. As will be discussed, there are varying accounts as to what happened in the apartment.

Ora Dale Ricks testified that on December 26, 1987, she lived on the seventeenth floor of the apartment building located at 3739 Federal, Chicago, with Sara Barnett and Coy Lee Harris. On that date, she was returning home from the hospital with Harris when they met Willis in the elevator of the apartment building. Willis asked Harris to stop off at Smith's apartment. Willis, Harris and Ricks then exited the elevator at the ninth floor and went to Smith's apartment. Once inside the apartment, Willis handed Ricks the yellow tumbler he had been holding and asked her to hold it. Ricks took the tumbler and walked to the kitchen. Willis and Harris remained in the living room. When Ricks came back to the living room, she saw Harris on the floor with Willis crouched over him, hitting Harris in the face with his fists. Ricks tried to stop them, but was unsuccessful. She then went to the back of the apartment and got Ruby Smith and Lawrence Willis. Nobody could stop the fight. At that time, Kitchen entered the apartment and started to help Willis by kicking and punching Harris. Kitchen then picked up a beer bottle and hit Harris over the head

with it, breaking the bottle. Ricks further stated that although Harris had a reputation for carrying knives, Ricks knew he did not have one that day because she had just had Harris arrested the day before for cutting her with a knife and the police had taken the knife away.

Ricks never saw Harris stand up during the fight, and she stated that she did not remember seeing anyone hit Harris with a baseball bat because she had blocked it out. The State then impeached Ricks' testimony with a prior statement she had made in which she stated that she had seen Willis repeatedly hit Harris with a baseball bat.

Ruby Smith then testified that on December 26, 1987, she was in her bedroom in her apartment on the ninth floor of 3739 S. Federal when a couple of her children came in and said Willis and Harris were fighting. When she went into the living room, Willis, Ricks, Harris and Willis' brother, Lawrence, were in there. Willis and Harris were "body slamming" each other. At that point, Kitchen entered the apartment. Harris reached with his right arm behind his back and Kitchen hit him over the head with a beer bottle. Harris fell to his knee, but got back up and continued to fight with Willis. At that point, Willis grabbed a baseball bat and hit Harris while he was kneeling down. Harris fell, face-up, and Willis hit him in the head three to five more times with the bat. Harris was bleeding and did not get up.

Smith then left her apartment to call the police from a telephone in another apartment. On her way back to her apartment, she saw Harris' body lying on the floor by the laundry room. When the police came, she identified Willis as Harris' attacker and the police took Willis to the squad car.

Although Harris usually carried knives in leather pouches attached to his belt, Smith did not see Harris with any knives that day. However, she thought he may have been wearing the pouches that day. On redirect, Smith stated that Kitchen and Harris did not fight with each other. Only Harris and Willis had been fighting.

On cross-examination for Kitchen, Smith testified that when Kitchen had entered the apartment, Harris was trying to pull on his gloves and then reached for something. At that point, Kitchen hit him with the bottle. Harris fell, but got up right away. He had not even been stunned by the bottle.

Marvin Kitchen, testifying on his own behalf, stated that as soon as he took one step into Smith's apartment, someone yelled, "Watch out." He saw Harris standing opposite the door, facing him. Willis was a few feet away. Harris came toward him very fast, gesturing with his hands like he was putting on gloves. Kitchen stepped toward Harris and grabbed him by the arms to prevent him from pulling out

any weapons. They then started to wrestle. While he was wrestling with Harris, Willis hit Harris and knocked him down on his knee. When Harris started to get up, Kitchen hit him with the bottle. Kitchen then walked away from Harris and started verbally arguing with Ricks. He did not strike Harris again.

While Kitchen was arguing with Ricks, he turned around and saw Willis strike Harris two to three times with a baseball bat. Ricks and Smith started screaming. Lawrence Willis ran over and snatched the bat from Willis' hand. Smith then left to call the police. Seeing the blood on the floor, Kitchen moved Harris' body out into the hallway near the laundry room. He did not put Harris' body in the laundry room.

On cross-examination, Kitchen stated that although he knew Harris' reputation for violence, Harris had never threatened Kitchen personally and Kitchen never actually saw Harris attack anyone or ever saw a knife inside the pouches that Harris wore. On the day of the incident, Kitchen did not see the knife pouches.

Chicago police officer Andre Watkins testified that on December 26, 1987, approximately 5 p.m., he received a message to assist paramedics at 3739 S. Federal. When he went to the ninth floor of that building, he saw the victim, who appeared to have been badly beaten around the head and upper body. The paramedics had found the body in the laundry room. Watkins noticed significant signs of blood in the laundry room and drag marks of blood in the hallway and laundry room. The trail of blood led to Smith's apartment.

Watkins then went to Smith's apartment. Smith opened the door and told Watkins that the offender was still there. Watkins looked inside, saw Willis, and asked him to step out into the hallway. When Willis stepped out, Watkins noticed that Willis had blood on his boots and on the back of his pants. Watkins then arrested Willis.

Detective James Redmond of the Chicago police department testified that he arrested Kitchen on March 15, 1988, and took him to police headquarters, where he was interviewed by an assistant State's Attorney. Kitchen's conversation was reduced to writing by the assistant State's Attorney and signed by Kitchen. The State tendered Kitchen's statement to the court. In summary, the statement stated the following: (1) when Kitchen entered the apartment, Willis and Harris were arguing in the living room; (2) after several seconds, Harris walked toward Kitchen, saying something that Kitchen could not remember; (3) Kitchen lowered his head and ran into Harris' chest, causing him to fall against the wall; (4) when his head hit Harris' chest, Kitchen punched Harris one or two times in the head;

(5) Kitchen told Willis to "be cool" and that he did not need Willis' help fighting Harris; (6) Willis struck Harris anyway, knocking him to the ground, where Willis continued fighting with him; (7) when Harris tried to get up, Kitchen picked up a beer bottle and struck Harris once on the top of the head; (8) Kitchen then began arguing with Ora Dale Ricks while Willis picked up a baseball bat and struck Harris three to four times in the head and back area; (9) Kitchen walked away from Harris, but remembered stepping on Harris' leg; (11) Kitchen and Willis carried Harris out to the porch; and (12) Kitchen returned to his girl friend's apartment.

Shaku Teas, a physician with the Cook County medical examiner's office, testified that the cause of Harris' death was cranial cerebral injury due to multiple blunt force, trauma or injuries.

During jury deliberations as to Willis, the jury sent out a note to the trial court, asking for clarification of the instruction on self-defense. Specifically, the jury asked whether the words "at the time he performed the acts" meant "during the entire circumstances" or "at the time of death." The defense objected to any response going back to the jury. Overruling the objection, the trial court responded by copying the words from the instructions on a notecard and underlining the words "performed acts" and "caused." Thirty minutes later, the jury returned with its verdict of guilty. The trial court entered judgment on the verdict and also found Kitchen guilty of first degree murder on an accountability theory. Subsequently, the trial court denied the motion for new trial filed by each defendant and sentenced Kitchen to a term of 20 years and Willis to a term of 28 years. Each defendant's timely appeal followed.

■■ ■ Defendant Willis initially argues that the State failed to prove beyond a reasonable doubt that he had not acted in self-defense. The affirmative defense of self-defense is raised only if defendant presents some evidence as to each of the following elements of the defense: (1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force he used was necessary; and (6) that the beliefs were reasonable. (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 415 N.E.2d 499.) Once defendant has presented some evidence as to each of these elements, the State has the burden of disproving the defense beyond a reasonable doubt. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275.) If the State negates any one of the self-defense elements beyond a reasonable doubt, it has met its burden of

proof. (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290.) The issue of self-defense is one of fact. Therefore, it is the function of the trier of fact to resolve any conflicts in the evidence and to determine credibility of the witnesses. (*People v. Perry* (1980), 91 Ill. App. 3d 988, 415 N.E.2d 523.) On review, the trier of fact's decision will not be disturbed unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. *People v. Zolidis*, 115 Ill. App. 3d 669, 450 N.E.2d 1290.

In the present case, Willis has failed to present evidence which would even raise the defense of self-defense. There is no evidence that Harris threatened Willis with imminent harm or that Harris was the aggressor. Both Ruby Smith and Ora Dale Ricks testified that they saw Willis and Harris fighting. However, neither of them knew how or why the fight started. Further, there is no evidence to support a reasonable belief by Willis that a danger existed and force was necessary to avert that danger. Although both Smith and Ricks testified that Harris usually carried at least one knife, neither of them saw Harris with a knife or any other weapon during the fight. While the law does not require that the aggressor be armed in order that the use of deadly force in self-defense be justified, it does require that the person against whom self-defense is allegedly used be an aggressor, that he be capable of inflicting serious bodily harm on defendant without the use of a deadly weapon, and that he appears to intend to inflict serious bodily harm. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275.) In *Estes*, following a jury trial, defendant was convicted of voluntary manslaughter in the shooting death of her husband. Just prior to the shooting, the husband had physically beat the defendant and would not leave her alone even after she begged him to do so. When he started to come toward her again, she shot him. The husband was a six-foot, 200-pound crane operator and, in the past, while unarmed, had physically injured defendant to the degree that she had to be hospitalized. On review, the appellate court reversed defendant's conviction on the ground that, considering all of the evidence, her belief that she had been in danger of death or great bodily harm was not unreasonable beyond a reasonable doubt. Therefore, she was justified in using deadly force.

Unlike in *Estes*, there is no evidence in the present case that, unarmed, Harris was capable of inflicting serious bodily harm on Willis at the time Willis struck him repeatedly with the baseball bat. In fact, it is highly unlikely that he could have inflicted any harm at all considering that both Willis and Kitchen were kicking and punching him. Further, the record reveals that Harris was 5 feet 4 inches, weighed

159 pounds, Kitchen was 5 feet 7 inches, weighed 135 pounds, and Willis was 5 feet 7 inches and weighed 180 pounds. Moreover, neither Smith, Ricks nor Kitchen saw him with a weapon.

■ Accordingly, because defendant has failed to present evidence to support a theory of self-defense, the burden of proof never passed to the State. However, even if it had, the State presented sufficient evidence to negate the elements of self-defense beyond a reasonable doubt with testimony indicating the absence of any threat of imminent harm to Willis.

Willis further argues that the State's comments during closing argument deprived him of his constitutional right to due process of law. Initially, Willis contends that the following statement made by the State during closing argument completely misstated the evidence:

"Ladies and gentlemen, the victim was helpless at that time. If the defendant thought this was self-defense, ladies and gentlemen, why did they drag the body from Apartment 912 down the hall and around the corner here to the laundry room?"

Willis argues that there was no evidence that he had dragged Harris' body down the hall.

■ ■ As a general rule, courts allow a great deal of latitude to the prosecution during closing arguments. If the prosecution's statements are reasonable inferences drawn from the evidence, they are within the bounds of proper argument. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) In the present case, the State's comments are reasonable inferences drawn from the testimony of Officer Andre Watkins, who stated that the paramedics found Harris' body in the laundry room and that there were significant signs of blood and drag marks of blood which created a trail leading directly to Ruby Smith's apartment. Watkins further testified that Willis had blood on the tops of his boots and on the back of his pants when he questioned Willis immediately after the incident. The testimony of Watkins coupled with that of Ruby Smith and Ora Dale Ricks as to the fact that Willis and Kitchen had been Harris' attackers provided sufficient evidence from which it could be inferred that Willis, either alone or with Kitchen, had dragged Harris' body out of Smith's apartment.

In support of his position, Willis relies on *People v. Rogers* (1988), 172 Ill. App. 3d 471, 526 N.E.2d 655, and *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629. However, these cases are distinguishable from the present case and, therefore, are unpersuasive. The *Rogers* court addressed the propriety of defense counsel's comments in the context of an ineffective assistance of counsel issue. In *Whitlow*, the State inferred that defendant had committed theft when there

was no evidence to support such an inference and the State had reason to know that its allegation was false.

Next, Willis contends that the State misstated the jury instruction regarding self-defense and confused the jury when it stated:

> "First of all, let us look as to why this is not a not guilty. There is no way you can possibly find this defendant not guilty. In order for [you] to find the defendant not guilty, you will *** have to believe that the defendant was acting in self-defense. I am not going to read the instructions to you again; however, the key words in that instruction is [*sic*] that the defendant believed he was in imminent—that he was defending himself against the imminent use of unlawful force; that he reasonably used the force that he used to prevent imminent death or great bodily harm to himself. Well, the key word is imminent use of force. That means that the victim in this case had to have had that knife out. That is the only way to get out of being stabbed himself, or sustaining great bodily injury himself was to pick up this bat and start swinging in order to prevent himself from receiving great bodily harm from—."

Willis contends that it is an individual's reasonable belief, not the deceased's actual possession of a weapon, that is operative in a self-defense claim.

■■■ The rule regarding self-defense is that if a defendant has a reasonable belief that he is in imminent danger of loss of life or great bodily harm, he may use deadly force to protect himself even though he is mistaken as to the danger and the danger is only apparent. The test is what a reasonable person would have believed under the circumstances. (*People v. White* (1980), 87 Ill. App. 3d 321, 409 N.E.2d 73.) Although the State's comment emphasized one of the elements of self-defense, it did not re-define the elements and misstate the law. The fact that the jury was properly instructed as to the elements of the offense plus the fact that, after the State's comments, the trial court emphasized that it is the jury's responsibility to decide what "imminent" and "reasonable belief" mean were sufficient to counter any misplaced emphasis resulting from the State's remarks. See *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.

■■ Finally, Willis' comment that the jury had sent out a note during deliberations seeking clarification of the word "imminent" is not supported by the record. Instead, during jury deliberations, the jury sent out a note to the trial court, asking whether the words "at the time he performed the acts" meant "during the entire circumstances" or "at the time of death." There is no suggestion in the rec-

ord that the jury was confused as to the meaning of "imminent." Accordingly, we conclude that the statements made by the State during closing argument do not, individually or cumulatively, provide grounds for reversal.

Finally, Willis argues that the trial court erred in responding to the questions which the jury sent it during its deliberations. During jury deliberations, the jury sent out a note to the trial court, asking for clarification of the instruction on self-defense. Specifically, the jury asked whether the words "at the time he performed the acts" meant "during the entire circumstances" or "at the time of death." The defense objected to any response going back to the jury. Overruling defense counsel's objection to any response going back to the jury, the trial court responded by copying verbatim the words from the instructions on a notecard and underlining the words "performed acts" and "caused." Willis argues that this was improper because: (1) the jury's inquiry was regarding a question of fact; (2) the instruction was clear on its face; and (3) by underlining the words, the trial court improperly expressed its opinion on the issue of self-defense.

Jury instructions are intended to inform the jury as to the correct principles of law applicable to the evidence admitted at trial (*People v. Taylor* (1977), 53 Ill. App. 3d 810, 368 N.E.2d 950), and the trial court has a duty to clarify an explicit question on a point of law over which there is doubt or confusion. *People v. Flynn* (1988), 172 Ill. App. 3d 318, 526 N.E.2d 579.

In the present case, it is clear that the jury's questions related to a point of law, not to a fact. As stated, jury instructions define the law (*People v. Taylor*, 53 Ill. App. 3d 810, 368 N.E.2d 950) and the jury's question concerned one of the terms of the jury instructions definition. The question did not ask for clarification as to facts. Further, the jury's query as to a point of law raised in the instructions belies Willis' argument that the instructions were clear on their face. It is imperative that a jury instruction not be confusing to the jury. If the correct principles of law have not been understood by the jury, it will be precluded from reaching a well-reasoned conclusion based on the law and evidence. (See *People v. Taylor*, 53 Ill. App. 3d 810, 368 N.E.2d 950.) Finally, Willis' contention that the trial court improperly expressed its opinion as to the outcome is not supported by the record. The trial court merely returned the original instructions to the jury and underlined that part of the instructions which answered the question. Accordingly, we conclude that the trial court did not err in responding to the jury's question submitted to the court during deliberations.

We shall next address defendant Kitchen's contentions. First, Kitchen argues that the trial court erred in finding him guilty of first degree murder on an accountability theory when the State had failed to present any evidence that Kitchen had intended to promote or to facilitate an offense at the time he attacked Harris. Pursuant to section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c)):

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

The intent to promote or to facilitate a crime can be shown by evidence that defendant and the principal shared a community of unlawful purpose. (*People v. Gil* (1984), 125 Ill. App. 3d 892, 466 N.E.2d 1205.) Actual words of agreement are not necessary to demonstrate this shared purpose. It can be inferred from the surrounding circumstances (*People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209), *i.e.*, defendant's presence during the commission of the crime without opposing or disapproving it (*People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834); defendant's close affiliation with his companion after the offense; and defendant's failure to report the crime. *People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.

In the present case, the surrounding circumstances demonstrate Kitchen's guilt of first degree murder on the accountability theory beyond a reasonable doubt. Shortly after Kitchen entered Ruby Smith's apartment, he and Willis were engaged in a physical altercation with Harris. At one point, Kitchen picked up a beer bottle and hit Harris over the head with it. Willis and Harris continued fighting and Willis grabbed a nearby baseball bat and started pummeling Harris on the head with it until Willis' brother, Lawrence, took the bat away from him. Kitchen made no effort to remove the bat. Ruby Smith then called the police and cleaned the blood and glass from the floor. Kitchen then helped Willis drag Harris' body out of the apartment. Although Kitchen was present when the paramedics arrived, he returned to his girl friend's apartment before the police arrived.

The facts in the present case differ markedly from those in *People v. Wise* (1990), 205 Ill. App. 3d 1097, 563 N.E.2d 1057, relied upon by Kitchen. In *Wise*, the victim testified that while he was in a sandwich shop, defendant came from behind him and grabbed him in a bear

hug. At the same time, Edgar Jones walked up to the victim, pulled a gold chain with a medallion from around the victim's neck and struck him in the eye. Two police officers arrived, and defendant and Jones fled. The police apprehended defendant and Jones and brought them back to the sandwich shop. However, the victim had left. The police then brought defendant and Jones to the police station, but charged them with only disorderly conduct because the victim never appeared to press charges. It was not until two detectives located the victim the next day that he indicated he had been the victim of a robbery and identified photographs of defendant and Jones. Defendant was then charged with aggravated battery and robbery.

Following a jury trial, defendant was granted a directed finding on the aggravated battery count and was found guilty of robbery on an accountability theory. On appeal, defendant claimed that there was insufficient evidence to establish his guilt beyond a reasonable doubt. The *Wise* court agreed and reversed defendant's conviction on the grounds that the only evidence as to defendant's involvement in the robbery was the inconsistent testimony of the victim who had been impeached by statements he had made exonerating defendant from any complicity in the robbery.

Unlike the situation in *Wise*, there was sufficient evidence in the present case to prove beyond a reasonable doubt that Kitchen played an active roll in the murder of Harris and demonstrated a shared common purpose with Willis to do great bodily harm to Harris.

Next, Kitchen argues that section 9—2 of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1989, ch. 38, par. 9—2) violates the due process clauses of the Federal and State constitutions by shifting the burden of proof away from the State and requiring the defendant to negate the mental state for first degree murder in order to reduce the offense to second degree murder. Section 9—2 provides:

> "Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:
>
> (1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or
>
> (2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the

killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder ***. In a jury trial for first degree murder in which evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder." Ill. Rev. Stat. 1989, ch. 38, par. 9—2.

As a general principle, legislative enactments carry a strong presumption of validity and the party challenging a statute has the burden of clearly establishing their invalidity. (*People v. Inghram* (1987), 118 Ill. 2d 140, 514 N.E.2d 977.) With respect to the burden of proof in criminal proceedings, it is axiomatic that the State has the burden of proving every element of a crime charged beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) The elements of first degree murder, as defined by section 9—1 of the Code, are: (1) the killing of another without legal justification, (2) with the intent to kill or to do great bodily harm to another or knowledge that such acts will cause death; or knowledge that such acts create a strong probability of death or great bodily harm. Once the State has proved these elements beyond a reasonable doubt, it has met its burden of proof. Section 9—2 of the Code defines the elements of second degree murder, which include two mitigating factors which can also be raised by a defendant who has been charged with first degree murder, *i.e.*, sudden and intense passion and justification. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.) When charged with first degree murder, if the defendant proves either of these mitigating factors by a preponderance of the evidence,

the offense of first degree murder will be reduced to second degree murder. Section 9—2 expressly provides that the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of murder.

■■ The mitigating factors set forth in section 9—2 are not elements of first degree murder to be proved beyond a reasonable doubt by the State. (*People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.) Therefore, it is not incumbent upon the State, in proving the elements of first degree murder, to prove the nonexistence of the mitigating factors of section 9—2. Further, proof of either of the mitigating factors does not act to negate the mental state of first degree murder. (*People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221.) In this respect, section 9—2 is distinguishable from the statute addressed in *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, a case relied upon by Kitchen. In *Mullaney*, the Supreme Court reviewed Maine's felonious murder statute, which provided that malice aforethought, an essential element of murder, would be conclusively implied unless the defendant could prove by a preponderance of the evidence that the killing occurred in the heat of passion. If defendant could prove that mitigating factor, the offense would be reduced to voluntary manslaughter. The Supreme Court held that this scheme improperly shifted the burden of proof from the prosecution to defendant by forcing defendant to negate an element of the statutory offense.

■■ Unlike the statute in *Mullaney*, section 9—1 does not raise a rebuttable presumption of defendant's guilt of first degree murder. Instead, if the prosecutor proves all of the elements of first degree murder set forth in section 9—1 beyond a reasonable doubt, defendant is guilty of first degree murder. If defendant then establishes one of the mitigating factors set forth in section 9—2 by a preponderance of the evidence, the offense of first degree murder is reduced to second degree murder. First degree murder cannot be reduced to second degree murder unless one of those separate mitigating factors set forth in section 9—2 is established by a preponderance of the evidence. By the express language of section 9—2, the burden of proving first degree murder beyond a reasonable doubt remains at all times with the State. See *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

The issue of the constitutionality of a statute similar to section 9—2 was addressed by the United States Supreme Court in *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319. The New York statute at issue in *Patterson* required that the defendant in a prosecution for second degree murder prove by a preponder-

ance of the evidence the affirmative defense of acting under the influence of extreme emotional distress in order to reduce the crime to manslaughter in the first degree. In holding that the statute did not violate the due process clause, the *Patterson* court stated:

> "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch. We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." 432 U.S. at 210, 53 L. Ed. 2d at 292, 97 S. Ct. at 2327.

Subsequently, in *Martin v. Ohio* (1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098, the Supreme Court extended the principles of *Patterson* to the issue of the affirmative defense of self-defense and held that the Ohio statute at issue which placed the burden of proving self-defense on the defendant did not violate defendant's constitutional rights to due process.

In Illinois, the issue of whether section 9—2 violates a defendant's constitutional rights to due process was addressed recently in *People v. Gore* (1991), 212 Ill. App. 3d 984, *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373, *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221, and *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335. Each court held that section 9—2 does not violate a defendant's right to due process. The *Jerome* court distinguished section 9—2 from the statute found unconstitutional in *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, on the grounds that in the statute analyzed in *Mullaney*, absence of provocation was an element of the crime of first degree murder. Therefore, it had to be proved by the State beyond a reasonable doubt and the burden of disproving that element could not be shifted to the defendant. By contrast, lack of provocation is not an element of first degree murder under Illinois law. Instead, pursuant to section 9—2, lack of provocation is a mitigating factor which, if

proven by a preponderance of the evidence by defendant, acts to reduce the offense of first degree murder to second degree murder. As stated by the United States Supreme Court in *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, requiring the defendant to prove a mitigating factor in order to reduce the offense to second degree murder does not violate due process.

The *Jerome* court further held that there is no inherent inconsistency between the mental states for first and second degree murder. In reliance on *Patterson*, the court stated:

> "When a defendant is charged with first-degree murder, the State is required to prove death, causation and intent (or knowledge). [Citation.] The defendant then has the opportunity to prove provocation or unreasonable belief in justification to reduce the offense to second-degree murder. [Citation.] The existence of provocation or an unreasonable belief in justification, however, will not diminish or negate any of the proved elements of first-degree murder. The mitigating factor is a separate issue the existence of which the State is willing to recognize as a circumstance affecting the degree of culpability or the severity of punishment." *Jerome*, 206 Ill. App. 3d at 436.

On similar grounds, the court in *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335, held that section 9—2 does not violate the defendant's constitutional right to due process because the defendant is not required to prove any of the elements of first-degree murder. He is merely required to prove a mitigating factor to reduce the offense. Accord *People v. Gore* (1991), 212 Ill. App. 3d 984; *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373.

Kitchen next argues that section 9—2 prohibits the State from charging the lesser offense of second degree murder, which constitutes an encroachment by the legislature on an exclusive power of the executive branch and violates the separation of powers clause of the Illinois Constitution. In response, the State argues that Kitchen lacks standing to assert the constitutional rights of prosecutors. Kitchen counters that his interest in receiving fair treatment from the State puts him within the "zone of interest" intended to be defended by the separation of powers clause.

■■■■ It is a fundamental principle of constitutional law that a court will inquire into the constitutionality of a statute only to the extent required by the facts before it and will not formulate a rule broader than necessary to resolve the precise situation presented. (*People v. Rogers* (1989), 133 Ill. 2d 1, 549 N.E.2d 226.) In the present case, two threshold issues preclude the necessity to reach the merits

of the separation of powers argument.[1] First, Kitchen's argument is predicated on a faulty premise. Second, Kitchen lacks standing to raise the issue. Regarding the premise, contrary to Kitchen's position, the State has the discretion to charge a defendant with second-degree murder pursuant to section 9—2. (*People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373; *People v. Burks* (1989), 189 Ill. App. 3d 782, 545 N.E.2d 782.) Regarding standing, a party has standing to question the constitutional validity of a statute only if he has sustained or is in immediate danger of having sustained some direct injury as a result of enforcement of the statute. (*People v. Rogers* (1989), 133 Ill. 2d 1, 549 N.E.2d 226; *People v. Esposito* (1988), 121 Ill. 2d 491, 521 N.E.2d 873.) Even if section 9—2 could be construed as prohibiting the State from charging a defendant with second degree murder, Kitchen is in no position to object to that result because he has failed to show how he has been directly injured. There is no indication in the record that the State attempted to charge defendant with second degree murder, but was barred from doing so by section 9—2. In fact, the record indicates that Kitchen was charged with first degree murder and armed violence. Accordingly, Kitchen lacks standing to raise a constitutional question as to whether section 9—2 violates the separation of powers clause by prohibiting the State from charging a defendant with second degree murder.

Next, Kitchen argues that section 9—2 of the Code deprives him of his constitutional rights to equal protection under the laws by singling out homicide defendants for more burdensome procedures than those faced by any other group of defendants. Specifically, Kitchen refers to section 9—2's requirement that homicide defendants prove the existence of mitigating factors by a preponderance of the evidence to reduce a first-degree murder charge to second-degree murder.

 The equal protection clause requires equality between groups of persons "similarly situated"; it does not require equality for those dissimilarly situated. (*People v. Eckhardt* (1989), 127 Ill. 2d 146, 535 N.E.2d 847.) By the definitions alone of the various criminal offenses, those accused of one offense are dissimilarly situated from those accused of another offense. (*People v. Bradley* (1980), 79 Ill. 2d 410, 403 N.E.2d 1029 (a defendant convicted of possession is not similarly situated to one convicted of delivery). See also *People v. Halcomb* (1988),

---

[1]We note that those courts which have discussed this issue on the merits have held that section 9—2 does not violate the separation of powers clause of the Illinois Constitution. *People v. Gore* (1991), 212 Ill. App. 3d 984; *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373.

176 Ill. App. 3d 100, 530 N.E.2d 1074 (defendant convicted of criminal sexual assault is not similarly situated to those convicted of other crimes); *People v. James* (1986), 148 Ill. App. 3d 536, 499 N.E.2d 1036 (because different elements must be established, those convicted of ordinary theft are not similarly situated to those convicted of retail theft); *People v. Adams* (1983), 116 Ill. App. 3d 315, 451 N.E.2d 1351 (defendant convicted of a criminal offense is not similarly situated to one found guilty in a civil action).) Accordingly, there is no equal protection violation.

For the aforementioned reasons, the judgments of the trial court are affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.