2020 IL App (1st) 161256-U

No. 1-16-1256

Order filed January 24, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 15804 |
| | ) | |
| SHELDON SMITH, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for second degree murder is affirmed where the evidence was sufficient to disprove his claim of self-defense.

¶ 2    Following a bench trial, defendant Sheldon Smith was convicted of second degree murder and sentenced to 28 years' imprisonment. Defendant appeals, arguing that the State failed to disprove he acted in self-defense. For the following reasons, we affirm.[1]

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

¶ 3    Defendant was charged by indictment with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)) in the shooting death of Joseph Brewer Jr. on July 14, 2013. Defendant's brother, Aries Sanders, was charged in the same matter and tried simultaneously.[2] Defendant asserted self-defense in his amended answer to the State's motion for pretrial discovery.

¶ 4    At trial, Brandy Henley testified that on July 14, 2013, she and defendant had plans to celebrate her birthday and at about 3 p.m. she drove to meet him and Mr. Saunders. Defendant was carrying a toolbox, which he placed on the floor by the front passenger seat. Mr. Sanders moved the toolbox to the back of the vehicle. Defendant then instructed Ms. Henley to drive to 105th Street and Oglesby Avenue in order to purchase marijuana and to talk to someone about a car. Ms. Henley acknowledged telling a grand jury that defendant wanted to go there to confront someone for "running up on" his brother.

¶ 5    After reaching their destination, defendant instructed Ms. Henley to park in the lot. Mr. Sanders handed something to defendant, but she did not know what it was. She denied that it was a gun. Ms. Henley acknowledged telling a grand jury that Mr. Sanders handed defendant a firearm which defendant placed "somewhere in his midsection."

¶ 6    Defendant and Mr. Sanders left while Ms. Henley remained in the vehicle listening to music, taking pictures, and texting. Mr. Sanders later returned, went to the back of the vehicle, and then left. Ms. Henley denied that she next heard gunshots, but acknowledged telling a grand jury that she heard three to five gunshots. Mr. Sanders again returned to the vehicle and asked Ms. Henley to open the trunk. She complied but did not see him place anything inside. Mr. Sanders walked away from the car. Shortly thereafter, Mr. Sanders and defendant, whose hand was

_____

[2] Mr. Sanders was found guilty of second degree murder. He is not a party to this appeal.

"wrapped up," returned and instructed Ms. Henley to drive. Before they could leave, police officers arrived and blocked their vehicle. Officers then searched the vehicle and retrieved something from the trunk.

¶ 7     On cross-examination, Ms. Henley testified that she believed they drove to the location so Mr. Sanders could arrange repairs for his vehicle and defendant could purchase marijuana. She denied that defendant said they were stopping to confront someone, or that she saw defendant and Mr. Sanders with a firearm. Ms. Henley stated that detectives coerced her into making those statements during two days at the police station when she was not given food or drink for a day and a half. The following colloquy occurred:

"[DEFENSE COUNSEL]: *** [Detectives] told you they weren't going to let you *** [and] your car go unless you told them what they wanted to hear; right?

[THE WITNESS]: Yes.

[DEFENSE COUNSEL]: And they told you that there had to be something going on over there, right?

[THE WITNESS]: Yes.

[DEFENSE COUNSEL]: They told you about this *** business [about defendant confronting someone], right?

[THE WITNESS]: *** Yes. Not verbatim, but yes."

Ms. Henley explained that a detective would start a sentence and that she was supposed to fill in the details. The detective said, "I don't want you to go down for this. You're going to be charged as an accomplice ***. You're smarter than that." Prior to trial, Ms. Henley informed the assistant

state's attorney (ASA) that she fabricated to detectives and the grand jury what she saw and heard on the date of the shooting.

¶ 8     On redirect examination, Ms. Henley testified that she reviewed her grand jury testimony with the ASA prior to trial, during which she confirmed that she made certain statements to the grand jury. She acknowledged that following the shooting, she gave police different versions of what happened before providing the version of events that she testified to during the grand jury proceeding.

¶ 9     Samantha Chelemsky, a Cook County State's Attorney employee, testified that prior to trial she sat in on conversations between Ms. Henley and the ASA. According to Ms. Chelemsky, Ms. Henley did not say that she presented false testimony during the grand jury proceedings. Instead, Ms. Henley repeatedly stated, "if that's what [the grand jury record] says, that's what I said." On cross-examination, Ms. Chelemsky testified that she did not take notes during these meetings, could not remember the exact dates on which they occurred, and did not know whether there had been other meetings.

¶ 10    Joseph Brewer Sr., testified that on July 14, 2013, he and his son, Mr. Brewer Jr. lived in Trumbull Park Homes, 11661 South Oglesby. Around 3 p.m., Mr. Brewer Sr. learned Mr. Brewer Jr. had been shot in the building complex.

¶ 11    On cross-examination, Mr. Brewer Sr. stated that when he arrived at the scene of the shooting, he photographed his son's body. Defense counsel showed Mr. Brewer Sr. a photograph of Mr. Brewer Jr. after he had been shot. Mr. Brewer Sr. stated that, in the photograph, Mr. Brewer Jr. had a weapon with an "open end" on his waist. Defense counsel also showed Mr. Brewer Sr. a

photograph in which Mr. Brewer Jr. was alive and appeared to be holding a firearm, which Mr. Brewer Sr. explained was a "water pistol."

¶ 12    Chicago police officer Daniel Castillo testified that he heard gunfire while driving with his partner near 106th Street and Oglesby. The officers ran towards the gunfire, which led them to Trumbull Park Homes. As they entered a courtyard within the building complex, Officer Castillo saw several people running in all directions and a man, later identified as Mr. Brewer Jr., lying on the ground. Officer Castillo noticed Mr. Brewer Jr. had been shot, turned him over, and saw a weapon tucked inside his waistband, later identified as a Browning 9-millimeter firearm. Officer Castillo recovered the firearm, which was missing a "bottom spring bracket" and was unloaded. On cross-examination, Officer Castillo testified that shell casings and pieces of a broken magazine were found near Mr. Brewer Jr.'s body.

¶ 13    Chicago police officer Thomas Kocanda testified that around 2:49 p.m., he received a call of shots fired and headed towards Trumbull Park Homes. There, Officer Kocanda saw defendant and Mr. Sanders walking from the courtyard of the building complex "pretty swiftly" towards the parking lot and entering a vehicle. Officer Kocanda spoke with the vehicle's occupants. The men appeared "sweaty" and "nervous," and defendant's hand was wrapped with a garment. Ms. Henley gave Officer Kocanda permission to search her vehicle. He found a firearm case in the trunk containing a magazine with bullets, but no firearm. On cross-examination, Officer Kocanda testified that defendant told him his hand was wrapped because he had been shot.

¶ 14    Chicago police sergeant Regina Hightower testified that she reported to Trumbull Park Homes with her partner to investigate a homicide. Upon arriving, Sergeant Hightower observed officers detaining Ms. Henley, Mr. Sanders, and defendant, who had a gunshot wound to his left

hand. Defendant told her that he went to purchase marijuana, and while doing so, someone started shooting. Sergeant Hightower requested all surveillance video of the incident and a gunshot residue test on defendant and Mr. Brewer Jr.

¶ 15   The State entered a stipulation that if called, Chicago Housing Authority employee Brian Frost would have testified that buildings in Trumbull Park Homes were equipped with functioning security cameras on the date of the shooting, and that unmanipulated, but incomplete, footage was obtained from those cameras. Videos of the surveillance footage were admitted into evidence.

¶ 16   The State published the surveillance footage during the testimony of Ms. Henley, Officer Kocanda, and Sergeant Hightower. The witnesses identified defendant, Mr. Sanders, and Ms. Henley in the videos, which are included in the record on appeal. The videos depict Ms. Henley parking at Trumbull Park Homes, defendant and Mr. Sanders exiting the vehicle, Mr. Sanders returning and moving an item from the vehicle's back seat into the trunk, defendant and Mr. Sanders returning to the vehicle, and police searching Ms. Henley's vehicle and removing a firearm case from the trunk.

¶ 17   Officer Joseph Scumaci, an evidence technician with the Chicago Police Department, testified that he photographed the crime scene. In the courtyard, Officer Scumaci discovered a group of four 9-millimeter cartridge cases and a magazine spring and follower. Outside the courtyard in a parking space, Officer Scumaci found a 9-millimeter cartridge case. Further north in the lot, Officer Scumaci found a .40-caliber cartridge case. On the other side of the building near 105th and Yates Avenue, Officer Scumaci found two .32-caliber cartridge cases on the sidewalk. Officer Scumaci then went to the hospital to photograph and fingerprint Mr. Brewer Jr. and perform a gunshot residue kit. On cross-examination, Officer Scumaci clarified that the

9-millimeter and .40-caliber cartridge cases were found in a lot that was separated by a building from the courtyard.

¶ 18    Chicago police officer Jessica Brady testified she recovered and inventoried a firearm during a probation check at an apartment in Chicago on August 13, 2013.

¶ 19    Marc Pomerance, a forensic scientist specializing in firearms and tool marks with the Illinois State Police, testified that he analyzed the Browning firearm and cartridge cases. The Browning firearm could not fire in the condition it was received because it was missing a magazine follower, spring, and floor plate. In his opinion, the floor plate could have been broken off intentionally or by a "jarring motion or force." The Browning firearm fired the 9-millimeter cartridge case found in the parking lot. Mr. Pomerance also received the firearm recovered by Officer Brady, an AA Arms Model AP9 pistol, which matched the group of four 9-millimeter cartridge cases found in the courtyard and the .32-caliber cartridge cases. On cross-examination, Mr. Pomerance testified that the vibration of the Browning firearm could have potentially dislodged its floor plate.

¶ 20    The State entered several stipulations. Relevant here, the medical examiner who performed Mr. Brewer Jr.'s autopsy would testify that Mr. Brewer Jr. sustained multiple gunshot wounds to his back, buttocks, thighs, and calves, and the manner of death was homicide. Next, proper chains of custody were maintained throughout the recovery of physical evidence. Further, a gunshot residue kit administered to Mr. Brewer Jr. indicated that he discharged a firearm, contacted an item with primer gunshot residue, or his right hand was in the environment of a discharged firearm. A garment recovered from defendant was in the environment of a discharged firearm.

¶ 21    Defendant testified that he had a prior felony conviction for attempt first degree murder for which he was sentenced to 10 years in prison and was on parole on July 14, 2013. The day before, Mr. Sanders asked defendant if he knew anyone selling a firearm. Defendant had a firearm to sell, so when Ms. Henley picked up him and Mr. Sanders to celebrate her birthday, defendant asked her to drive them to Trumbull Park Homes where he would complete the sale. Defendant told Ms. Henley they were only going to purchase marijuana and did not inform her that he had a firearm that he intended to sell.

¶ 22    At Trumbull Park Homes, defendant and Mr. Sanders exited the vehicle. Another individual, Warren,[3] met them and walked them towards his apartment. Mr. Sanders then retrieved the firearm case, which contained the firearm, from Ms. Henley's vehicle, and returned to Warren's apartment. Inside, defendant assembled the firearm and concealed it in a black long-sleeve sweatshirt. Defendant acknowledged that a video from one of the cameras showed him standing behind a door in a corridor and looking outside. He stated that he did this because he knew he "was doing something illegal" and wanted to ensure no police were present.

¶ 23    Surveillance video was played during defendant's testimony. The footage shows two people walking through the courtyard until they can no longer be seen on camera, followed by defendant and several other people at 2:46 p.m. and 11 seconds. At 2:46 p.m. and 36 seconds, everyone starts running, and Mr. Brewer Jr. falls to the ground.

¶ 24    Defendant testified that Warren took defendant and Mr. Sanders to the courtyard to meet Mr. Brewer Jr., whom defendant did not previously know or have animosity towards. After negotiating the firearm's price, Mr. Brewer Jr. "turned slightly," drew a firearm, and shot at

---

[3] Warren's full name is not included in the record on appeal.

defendant, hitting his hand. Defendant was "shocked," and shot back at Mr. Brewer Jr. while running away. Defendant ran to Warren's apartment, put his firearm under a couch, and returned to Ms. Henley's vehicle.

¶ 25    On cross-examination, defendant testified that he loaded the firearm he intended to sell before Mr. Sanders asked him about selling it. While inside Warren's apartment prior to the shooting, defendant put more ammunition in the firearm. Defendant denied that he shot himself during his exchange with Mr. Brewer Jr.

¶ 26    In closing, the State argued that defendant and Mr. Sanders committed first degree murder, emphasizing that defendant and Mr. Sanders went to Trumbull Park Homes with a firearm in order to confront Mr. Brewer Jr. According to the State, defendant shot at Mr. Brewer Jr. at least four times, striking him in his back, the back of his legs, and calves. Officers arrived immediately thereafter and found Mr. Brewer Jr. with a broken firearm still in his waistband, and the only recovered shell casing that matched Mr. Brewer Jr.'s firearm was not found in or near the courtyard where the shooting occurred.

¶ 27    Defense counsel argued that the State failed to disprove that defendant acted in self-defense where the evidence showed that he suffered a gunshot wound and Mr. Brewer Jr. had gunshot residue on his hand, which corroborated defendant's testimony that Mr. Brewer Jr. fired at defendant first. Moreover, the State's case relied on Ms. Henley's statements to detectives and the grand jury, which she testified were coerced. In the alternative, defense counsel argued the evidence only supported a second degree murder conviction.

¶ 28    The trial court found defendant guilty of second degree murder. In so doing, the court stated the undisputed evidence showed that defendant and Mr. Sanders went to Trumbull Park Homes

with "a loaded, serious weapon," and defendant shot Mr. Brewer Jr. While Mr. Brewer Jr. had a firearm in his waistband and gunshot residue on his hand, the bullet from Mr. Brewer Jr.'s firearm was not found at the crime scene. The court noted that surveillance video may not have captured all the events that contributed to defendant's mental state at the time of the offense, but stated he did not have any "good purpose" for going to Trumbull Park Homes or "any outright justification" for shooting Mr. Brewer Jr.

¶ 29    Defendant filed a motion to reconsider the finding of guilty, or in the alternative, for a new trial, which the trial court denied, noting that "some circumstances" supported a second degree murder conviction. Following a hearing, the trial court sentenced defendant to 28 years in prison.

¶ 30    On appeal, defendant concedes that he shot and killed Mr. Brewer Jr., but argues the State failed to disprove that he acted in self-defense where the evidence indicated that Mr. Brewer Jr. fired the first shot, striking defendant in the hand.

¶ 31    In reviewing a challenge to the sufficiency of the evidence, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. As such, we allow all reasonable inferences from the record in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 32 In this case, defendant was charged with first degree murder, raised the affirmative defense of self-defense, and was ultimately convicted of second degree murder. Relevant here, a person commits first degree murder where he causes the victim's death and either (1) intended to kill or do great bodily harm or knew that his acts would cause death, or (2) knew that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2012). A person commits second degree murder when he commits the offense of first degree murder under an unreasonable belief in self-defense. 720 ILCS 5/9-2(a) (West 2012).

¶ 33 Self-defense is a lawful justification to first degree murder. 720 ILCS 5/7-1 (West 2012); see *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). To raise the issue, a defendant must present some evidence that:

> "(1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force he used was necessary; and (6) that the beliefs were reasonable."
> *People v. Willis*, 217 Ill. App. 3d 909, 917 (1991).

Once a defendant successfully raises the issue, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense (*People v. Olaska*, 2017 IL App (2d) 150567, ¶ 143), by negating any one of the six elements (*Willis*, 217 Ill. App. 3d at 917-18). Whether a killing is justified as self-defense presents a question of fact. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004).

¶ 34 After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that the State proved beyond a reasonable doubt that defendant lacked

a reasonable belief in self-defense. The record shows that defendant carried a concealed, loaded firearm when he encountered Mr. Brewer Jr. in the courtyard. Defendant shot at Mr. Brewer Jr., hitting his back, buttocks, thighs, and calves. The locations of Mr. Brewer Jr.'s wounds suggest that he was facing away from defendant when he was shot. Additionally, outside of defendant's testimony, there was no evidence that Mr. Brewer Jr. fired the bullet that struck defendant's hand, or that the gunshot residue on Mr. Brewer Jr.'s hand came from his own firearm. Although Mr. Brewer Jr. possessed a firearm at the time of the incident, he was found with it tucked inside his waistband. That firearm was missing various parts, making it inoperable, and the only bullet fired from it was located far from where the shooting occurred. Moreover, defendant admitted to police that he fled after shooting Mr. Brewer Jr., discarded his weapon in Warren's apartment, and tried to leave in Ms. Henley's vehicle before officers stopped him. Defendant's attempt to flee after the shooting constitutes circumstantial evidence of guilt. See *People v. Lewis*, 165 Ill. 2d 305, 349 (1995) ("The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the [trier of fact] as tending to prove guilt."). Taken as a whole, this evidence allows for the reasonable inference that defendant was not acting in self-defense when he shot and killed Mr. Brewer Jr. See *Young*, 347 Ill. App. 3d at 920 ("A [trier of fact] may consider the probability or improbability of the defendant's account, the circumstances surrounding the crime, and the relevant testimony of other witnesses." (Internal quotation marks omitted.)).

¶ 35 Nevertheless, defendant contends the State failed to disprove that he acted in self-defense because he testified that Mr. Brewer Jr. fired at him first, hitting his hand, the evidence showed

that Mr. Brewer Jr.'s hand had gunshot residue on it, and defendant in fact suffered a gunshot wound.

¶ 36    Defendant essentially asks us to reweigh the evidence in his favor and substitute our judgment for that of the trier of fact, which we cannot do. See *People v. Collins*, 214 Ill. 2d 206, 217 (2005) ("In reviewing the evidence, it is not the function of th[is] court to retry the defendant, nor will we substitute our judgment for that of the trier of fact."). The trial court heard from multiple witnesses, including defendant, about the events surrounding the shooting. In announcing its ruling, the court noted that it did not accept defendant's version of events because there was "no good purpose" for defendant to bring a loaded firearm to the scene of the shooting. See *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001) ("a fact finder need not accept the defendant's version of events as among competing versions"). After reviewing the record on appeal, we cannot say that the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt as to defendant's guilt of second degree murder. See *Brown*, 2013 IL 114196, ¶ 48. Thus, we affirm the trial court's judgment.

¶ 37    Affirmed.