2020 IL App (1st) 182168-U

No. 1-18-2168

Order filed August 13, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 60021 |
| | ) | |
| CHARLES WILKS, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for aggravated discharge of a firearm affirmed where the State proved beyond a reasonable doubt that he did not act in self-defense; the trial court did not abuse its discretion when it denied defendant's request for probation and sentenced him to a term of four years with the Illinois Department of Corrections.

¶ 2    Following a bench trial, defendant Charles Wilks was convicted of aggravated discharge

of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) and sentenced to four years' imprisonment.

On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt

because it failed to prove that he did not act in self-defense where his testimony was credible and unimpeached while the State's witnesses gave conflicting testimony that was impeached. Defendant also contends that the trial court abused its discretion when it denied his request for probation and sentenced him to prison because his mitigating evidence showed he had great potential for rehabilitation, and the court gave improper consideration to other firearm cases and a factor inherent in the offense. We affirm.

¶ 3    Defendant was charged with two counts of attempted first degree murder and one count of aggravated discharge of a firearm. At trial, Norman Scott testified that he was 65 years old and had been a truck driver for 39 years. About 5:30 p.m. on December 6, 2016, Scott was driving his tractor-trailer truck northbound on Interstate 94, attempting to merge onto Interstate 57 to exit at Halsted Street. Scott had difficulty merging due to heavy rush-hour traffic. A grayish four-door Lexus would not speed up or slow down to allow Scott to merge into the middle lane. Scott activated his turn signal and slowed down to merge. When that was unsuccessful, Scott increased his speed. The driver of the Lexus took the same action as Scott. Eventually, Scott was able to merge and exit at Halsted. He did not observe where the Lexus went. Due to heavy traffic, Scott sat slightly past the top of the exit ramp for a few minutes.

¶ 4    While sitting in traffic at a red light, Scott observed the Lexus driving up the ramp on his left side, about 100 feet from his truck. The Lexus stopped and the driver exited the vehicle. The driver walked in front of his Lexus towards the front of Scott's truck. While standing directly in front of the truck, the driver drew a handgun and pointed it at Scott. Scott bent over and ducked down inside the cab of his truck. Scott heard about five gunshots coming from in front of his truck. The gunshots struck Scott's windshield. Scott pressed his accelerator and his truck began moving

forward. There were other vehicles in front of his truck. The gunman walked to the passenger side of Scott's truck and fired "a couple more" gunshots at the passenger window. The gunman then went towards the back of Scott's truck. Scott testified that the gunman appeared to be "white, bright color."

¶ 5 When the gunshots stopped, Scott sat up inside his truck and accelerated to the corner of Halsted. He made a right turn and headed northbound on Halsted. While driving, Scott called 911. In his mirror, Scott observed the Lexus following about five or six cars behind him. Scott remained on the phone with the 911 operator as he turned and drove westbound on 95th Street. As he approached Vincennes Avenue the police arrived. Scott subsequently viewed a photo array but was unable to identify anyone in the array as the shooter.

¶ 6 In court, Scott identified two photographs of his truck taken after the shooting. The first photograph depicted the front of Scott's truck with five bullet holes in the windshield. The second photograph depicted the shattered passenger-side window of the cab of his truck.

¶ 7 A recording of Scott's 911 call was admitted into evidence and published to the trial court. This court listened to the recording during which Scott reported: "I just had a driver shoot at me; I'm in a truck. I just had a guy shoot my windows out." Scott explained that he was attempting to exit the expressway at Halsted and a gray Lexus with yellow fog lights blocked Scott and would not let him exit. Scott stated that he drove around the Lexus and exited the expressway, and the Lexus followed him up the ramp. Scott reported that the driver of the Lexus "jumped" out of the car "and shot at me right in front of everybody." Scott stated, "he shot my windshield, he shot my side window out, he's trying to kill me." Scott described the gunman as a white man. While speaking with the 911 operator, Scott stated that he was driving on Halsted, approaching 95th

Street, and preparing to turn westbound onto 95th Street. Scott stated, "I have to keep moving because I think he's behind me." He further stated, "It looks like he's trying to go around. I'm pretty sure that's the same car." Scott reported that he had "glass all over me," but was not bleeding. As Scott sat in traffic, he asked the 911 operator if the police were coming, reported that the Lexus was still following him, and repeatedly stated "I can't believe this. Oh my God."

¶ 8    On cross-examination, Scott acknowledged that Halsted was the first exit after the merge from Interstate 94 to 57, and that he had to move over through traffic quickly to make the exit. It was dark and Scott had his headlights on. When he exited, he drove to the top of the ramp and stopped. Scott was in the middle lane of the ramp, preparing to turn right onto Halsted. Other vehicles were also on the ramp. The Lexus came up the ramp on Scott's left side and was in the lane next to him. Scott kept his truck in gear. He had a "pretty clear" view of the man who exited the Lexus. After the shooting, Scott accelerated past the other vehicles on the ramp and made a right turn onto Halsted.

¶ 9    On redirect examination, Scott testified that, prior to walking in front of his truck, the gunman did not say anything to Scott, nor did he make any gestures towards Scott. The gunman did not say anything before he began shooting. On recross-examination, Scott acknowledged that he had never observed the gunman before and that no shots were fired on the expressway.

¶ 10    Alyssa Mostyn, an elementary school principal, testified that about 5:30 p.m. on December 6, she was driving home on Interstate 94 merging onto southbound Interstate 57 to exit at Halsted. The traffic was "highly congested." In front of her was "a very tight spot with a truck." She was behind the truck. Mostyn merged across three lanes of traffic to exit at Halsted. She was in the center lane of the exit ramp. A truck pulled up on the driver's side of her vehicle, and a sedan

pulled up on her passenger side. The sedan parked and a man exited the vehicle, leaving his door open. The man was of average height with a fair complexion and wore a dark hooded sweatshirt. The man fired a gun over Mostyn's vehicle towards the truck. The gunman shot once at the back of the truck, went to the driver's side of the truck where Mostyn could not observe him, and came around to the passenger side of the truck where she observed him again. Mostyn observed the gunman fire "a few more times" into the passenger side window of the truck. The gunman returned to his vehicle. After the shooting, the truck headed north on Halsted. The sedan drove around Mostyn's vehicle and followed the truck. Mostyn observed the gunman's license plate number. She called 911 and reported the shooting.

¶ 11    Mostyn's 911 call was published to the court and admitted into evidence and published to the trial court. In that call, Mostyn reported that she had exited Interstate 57 at Halsted and observed a man exit his vehicle and fire three or four gunshots at a truck. The gunman was white or Hispanic and wore a hooded sweatshirt. The gunman was driving a silver four-door sedan with a special license plate that had a red line at the top. Mostyn gave the license plate number to the 911 operator. Mostyn reported that after the shooting, the truck headed north on Halsted and the gunman followed the truck. Mostyn stated, "the truck was trying to get away from him after being in the left lane and then the car cut in front of me to follow him."

¶ 12    On cross-examination, Mostyn clarified that she was in the center lane of the exit ramp, the truck was ahead of her in the left lane, and the gray Lexus was behind her in the right lane. The gunman exited his vehicle with his gun already drawn and immediately fired a gunshot over the hood of her vehicle at the back of the truck. Mostyn testified that she observed the gun immediately and it was never concealed. About a month after the shooting, Chicago police detective Joseph

Murtaugh called Mostyn and came to her house to discuss the incident. When counsel asked Mostyn if she told Murtaugh that the gunman shot at the back of the truck, she replied "I cannot imagine that I left that out." Mostyn subsequently spoke with Murtaugh again at the police station. She testified that she believed she told him that the gunman shot once at the back of the truck.

¶ 13 Pursuant to questions from the court, Mostyn clarified that, unlike most merges, she merged onto Interstate 57 in the far-left lane and had to cross over three lanes of traffic to the far-right lane to exit at Halsted. The exit ramp ascended higher than the interstate. There were three lanes of traffic on the ramp and a stoplight at the top of the ramp. There were other vehicles in front of Mostyn stopped at the light. The truck was in front of her and to her left on her driver's side, and the sedan pulled up on her passenger side. The front of the sedan was "in line" with her passenger-side mirror. Mostyn observed a man exit the sedan, and while standing behind his open vehicle door, the man raised a gun and fired one or two shots at the back of the truck. The gunman walked around her vehicle so that he was on her driver's side. Mostyn could not recall if he walked in front of or behind her vehicle. The gunman walked to the left lane and approached the truck. He walked to the driver's side of the truck and Mostyn lost sight of him because the truck's trailer blocked her view. Mostyn next observed the gunman when he was standing in front of the truck on the passenger side between the left and middle lanes. Mostyn observed the gunman fire two or three more gunshots into the passenger side of the truck's cab. The gunman walked back to his vehicle and entered it. The light changed and the truck began moving forward. The vehicles in the middle lane also moved forward. The gunman moved his vehicle over to the left lane and followed the truck. The truck and the sedan both crossed over two lanes of traffic and made a right turn onto

Halsted from the left turn lane. Mostyn then lost sight of both vehicles. Neither party had any questions based on the court's questioning.

¶ 14    Hannah Johnson testified that about 5:30 p.m. on December 6, she was driving on the Bishop Ford expressway in heavy rush-hour traffic. As she exited at Halsted, she observed a silver vehicle cross over most of the lanes of traffic at the last minute to exit at Halsted in front of her. Johnson continued exiting onto 99th Place and pulled into the right lane. The silver vehicle was two car lengths in front of her on the exit ramp. The stoplight on the ramp was red and she was stopped in traffic for a few minutes. Johnson heard several gunshots in front of her. She looked up and observed a man with his arm extended holding a gun in his hand shooting towards the south lane of 99th Place. The gunman was black with an average build wearing a hoodie. Johnson observed that the door of the silver vehicle was open and observed the gunman returning to that vehicle. Johnson backed up her vehicle and drove down an alley to leave the area and called 911.

¶ 15    Johnson's 911 call was admitted into evidence and published to the trial court. In that call, Johnson reported that she had exited the Bishop Ford at Halsted and observed a man exit a silver vehicle and shoot at another vehicle. Johnson stated that the gunman had "cut in front of a bunch of people to get off on the exit and then he got out of his car and he shot I think about four or five shots" towards the south lane of traffic. The gunman was black. His vehicle was three car lengths in front of hers and looked similar to a Chevrolet Impala. The gunman was returning to his vehicle when Johnson drove away.

¶ 16    On cross-examination, Johnson confirmed that there were three lanes of traffic on the exit ramp. The gunman's vehicle was in the right lane, the same as hers, and was two or three car lengths in front of her. Johnson observed a semi-truck in the far left-turn lane. She did not observe

the truck exit the interstate. Nor did she observe the gunman exit his vehicle. Johnson acknowledged that in her 911 call she stated that she observed the gunman exit his vehicle. She did not observe him shooting from the door of his vehicle but observed him returning to that door. Johnson could not recall if she specifically told the 911 operator that she observed the gunman begin shooting. Pursuant to defense counsel's request, Johnson's 911 call was replayed in court. Thereafter, Johnson acknowledged that she told the operator that she observed a person exit a vehicle and shoot at someone. She did not observe the gunman move anywhere other than observing him return to his vehicle.

¶ 17    Pursuant to questions from the court, Johnson confirmed that she first observed the subject vehicle on the expressway. The court asked her to repeat exactly what she remembered observing when she first noticed the vehicle. Johnson testified that she was in the right lane after merging from the Dan Ryan expressway. The silver vehicle caught her attention when it cut across multiple lanes of traffic at the very last moment to leave the expressway at the exit. Initially, the silver vehicle was directly in front of Johnson on the exit ramp. The vehicle sped up quickly and went around the vehicle in front of it. Johnson noted "[t]here wasn't much room." Johnson testified that she "kept an eye on the car because of the aggressive driving." The vehicle was two or three car lengths in front of her when they reached the light where everyone was stopped. Johnson was looking at her dashboard when she heard gunshots. She looked up and observed the gunman shooting directly south towards the left-turn lane. The gun appeared to be pointed at a vehicle in that lane. As Johnson backed up her vehicle to enter the alley, she observed the gunman returning to the open door of his vehicle. The gunman returned to the same silver vehicle she earlier observed crossing over the lanes of traffic.

¶ 18    Pursuant to further questions from defense counsel, Johnson testified that she did not recall observing the semi-truck exit Interstate 57. She first observed the truck while it was being shot at on the exit ramp. Johnson did not know which specific vehicle the gunman was shooting at. She did not hear the gunman or anyone else say anything. She observed the gunman entering his vehicle before she drove into the alley.

¶ 19    Chicago police detective Joseph Murtaugh testified that on December 7, he was assigned to investigate the shooting that occurred the previous day. The police reports listed a license plate number for the offender's vehicle. Murtaugh entered that license plate number into the Illinois Secretary of State's database and learned that the vehicle was registered to defendant. He obtained defendant's driver's license photograph, which he included in a photo array. Murtaugh listened to recordings of all the 911 calls made to the Chicago police and the Illinois State Police in relation to this case. Those recordings included defendant's call to 911 in which he stated that he was involved in an accident on the expressway, that a truck had cut him off, and that he discharged a weapon into the truck. Based on information in the 911 recordings, Murtaugh interviewed Scott and two independent eyewitnesses, Alyssa Mostyn and Hannah Johns.[1] The photo array was shown to Scott and Mostyn by other officers. Murtaugh called the phone number defendant gave during his 911 call but was unable to reach him. Two police officers were dispatched to defendant's address to attempt to find him. On January 18, 2017, defendant came to the police station accompanied by his attorney, at which time he was arrested. Murtaugh identified defendant in court. On cross-examination, Murtaugh acknowledged that defendant stated during his 911 call that he had discharged his weapon because he was almost run over.

---

[1] Throughout the rest of the record, this witness is identified as Hannah Johnson.

¶ 20    The State presented a stipulation for the foundation of the recording of defendant's 911 call to the Illinois State Police, which was admitted into evidence. This court listened to the recording during which defendant reported that a semi-truck had sideswiped the rear of his vehicle while they were driving on Interstate 57. Defendant was driving a green 2003 Lexus. The truck and defendant exited the expressway and were stopped at a stoplight at Halsted and 95th Streets with the truck in front of defendant's vehicle. Defendant stated, "I cut him off, got in front, and he tried to run me over with the truck." Throughout the call, defendant repeatedly stated: "He tried to run me over." Defendant further stated, "I discharged my weapon" and "I shot through his window."

¶ 21    The State presented a stipulation that Daniel Ilao, a Verizon Wireless employee, would testify that a specific telephone number was assigned to defendant with a Verizon account, and that Verizon's records indicated that on December 6, 2016, four calls were made to 911 from that number. The parties stipulated to the foundation for the Verizon records produced by Ilao, and the document showing four 911 calls made within two minutes was admitted into evidence.

¶ 22    The defense presented a stipulation that Murtaugh would testify that about 6 p.m. on January 16, 2017, he had a phone conversation with Mostyn, he wrote a report summarizing that conversation, and nowhere in that report did it say that Mostyn said the driver shot at the back of the truck. Murtaugh would further testify that he had an in-person conversation with Mostyn that same day, wrote a report summarizing that conversation, and the report did not indicate that Mostyn said the driver shot at the back of the truck.

¶ 23    Defendant testified that he was 43 years old and until December 6, 2016, had been employed as a Chicago firefighter for 14 years. Defendant had also worked as a security guard at

a facility run by the Department of Children and Family Services. Defendant had a firearm owner's identification (FOID) card and a concealed carry license (CCL), and had owned a firearm since he was 21 years old. Defendant carried the gun for protection because he was shot during an attempted carjacking in 1996. The gun was a .40-caliber Springfield Armory. He carried the weapon every day except when he was at the firehouse, where it was not allowed.

¶ 24   Shortly after 5 p.m. on December 6, defendant left his part-time security job at Aunt Martha's Children Reception Center. He entered his 2003 Lexus and retrieved his firearm from underneath his seat where he kept it while he was working. Defendant placed his gun in the small of his back, which was what he normally did. He drove southbound on the Dan Ryan expressway heading to his daughter's high school basketball game. As he merged onto Interstate 57, defendant was in the left lane closest to the median. He observed a white tractor-trailer truck merging onto Interstate 57 from Interstate 94. After the merge, the truck was in the far-left lane and defendant's lane became the second lane, adjacent to it.

¶ 25   Defendant's vehicle was near the rear of the truck. Defendant observed the truck trying to move into his lane. Defendant honked his horn and the truck repositioned itself in the left lane. Defendant was not angry or upset. The rear of defendant's vehicle was next to the rear wheels of the truck. The truck again came into defendant's lane and was "extremely close" to his vehicle. Defendant heard a loud crash, like a thumping noise, and grinding. Defendant believed the truck had struck his vehicle. Defendant sped up, and as he passed the truck, he stuck his hand out the window and signaled to the truck driver to pull over. Defendant was not angry but was upset that the truck driver was "basically playing with a vehicle" and could have hit other vehicles and killed people. After defendant passed the truck, the truck moved into defendant's lane behind his vehicle.

The truck moved into the right lane and further right into the exit lane. Defendant moved into the adjacent lane alongside the truck. It was clear to defendant that the truck was not pulling over. He intended to follow the truck until they could stop and exchange insurance information. Defendant slowed down to let the truck pass him so he could also move into the exit lane. The truck driver swayed the truck towards the passenger side of defendant's vehicle and attempted to hit defendant again. Defendant slammed on his brakes and steered to his left so the truck would not strike his vehicle. Defendant moved behind the truck and they both exited at 99th Street. Defendant was upset and a little shaken.

¶ 26    The exit ramp had a traffic light at Halsted. The truck stopped at the top of the exit ramp, about 400 to 500 feet before the light. The truck was in the center lane and defendant was in the left lane. Defendant drove around the truck and pulled over into the right lane about 10 to 15 feet ahead of the truck. Defendant parked his vehicle along the right curb. He exited his vehicle and observed damage over the rear wheel on the driver's side. Defendant looked at the truck and pointed at his vehicle to gesture that it had been struck. The truck driver did not respond. Defendant was upset. Traffic was exiting the expressway but there were no other vehicles on the street.

¶ 27    Defendant walked towards the truck to notify the driver that he had hit defendant's vehicle and to exchange insurance information. As defendant walked in front of the truck and looked down at the license plate, the truck "lunged forward" at him. He was about three feet from the front of the truck. Defendant attempted to "get" out of the way by "back pedaling" towards the curb. The truck continued moving forward, and as it became closer to defendant it turned in his direction. Defendant testified that he was scared for his life and believed he was going to be run over and killed. He drew his gun and fired two to three shots while still moving backwards. Defendant

stopped shooting because he was no longer in danger. Defendant testified that his intention was to save his life and he had no intent to kill Scott. He believed he had no other choice but to discharge his weapon.

¶ 28    The truck continued moving forward towards Halsted. Defendant returned to his vehicle and followed the truck. While doing so, he called 911 and reported the incident. Defendant testified that he was not in his right mind, was rattled and panicked. He caught up to the truck around 97th Street and was directly behind it. Defendant did not fire any additional gunshots at the truck. Defendant stayed behind the truck as they both turned left onto 95th Street. He eventually stopped following the truck.

¶ 29    On cross-examination, defendant acknowledged that after calling 911 he did not wait for the police to arrive at the scene. He went to his daughter's basketball game. Defendant repeatedly testified that at the time of the incident there was no traffic on the exit ramp and no other vehicles in that area. The truck was stopped and sitting still in the middle lane of the ramp, 600 feet from the traffic light which was initially green. There was no traffic around the truck and nothing to prevent it from proceeding forward. When defendant pulled over to the curb, he was in the right turn lane. Defendant could not see the truck driver at any time during the incident. Defendant's gun was a semiautomatic and he always kept a bullet loaded in the chamber. Defendant did not call the police again, but instead, was contacted by the police on January 16. He did not report the damage to his vehicle to the police.

¶ 30    On redirect examination, defendant testified that there were vehicles driving on 99th Street. Defendant did not draw or shoot his weapon until the truck started coming at him. He again testified that he fired his weapon because he was afraid for his life.

¶ 31    Chicago firefighter Thomas Cody testified that he had known defendant for about 14 years and that defendant was one of the most courteous men on the job, always truthful and willing to help. Chicago firefighter Richard Cooper testified that he had known defendant for about 10 years, that defendant was "an extremely truthful, honest man," and that he was a very good employee who never engaged in arguments at the firehouse or exhibited unpeaceful behavior. Chicago police officer Lynette Brady testified that she had known defendant for about 15 years and that they had worked together at a group home. She testified that defendant had a "very calm demeanor" and was a "very honest" man who took care of his family and coworkers.

¶ 32    The trial court found that this case involved "road rage, aggressive driving, rush hour traffic schedules, work schedules" and people wanting to reach destinations which led to "very dangerous driving." The court found that the evidence showed that there was some interaction between defendant and Scott on the expressway. It pointed out that "defendant and only the defendant" testified that there was contact between the truck and his vehicle. The court found that defendant's testimony that his vehicle was damaged was "completely uncorroborated." The court noted that defendant called 911; however, after telling the operator that he had discharged his firearm at a truck, he left the scene rather than wait for the police to arrive.

¶ 33    The trial court further found that "defendant's entire version of his testimony also is somewhat uncorroborated by the other witnesses." The court noted that defendant testified that there was no traffic on the exit ramp and that the truck stopped 600 feet from a green light with no traffic blocking its path. The court found that defendant was "obviously suggesting that the truck driver was sort of somehow laying in wait" for him to do something, which "defie[d] common sense." The court found defendant's testimony was "also directly contradicted by the direct

testimony of the civilian witnesses" who described the traffic in the area and on the ramp, and Scott's testimony that he was stopped at a red light.

¶ 34     The trial court noted that the versions given by the State's witnesses were contradictory but found that was "explainable given the extraordinary circumstances that they had just observed" of a man firing a gun in front of them. The court found that Mostyn's testimony could not be "accepted in totality" where her testimony that the gunman fired the first shot at the rear of the truck was contradicted by the fact that she did not report that in her 911 call or to Murtaugh. The court pointed out, however, that did not mean Mostyn was "lying" or that everything she said had to be dismissed because it was "an excited occurrence." The court noted that Scott, Mostyn, and Johnson observed the shooting, and specifically found that Scott's testimony was credible.

¶ 35     The trial court stated "[t]he bottom line here, however, is that I do not believe that the defendant was acting in self-defense." The court found there was no corroboration for defendant's testimony that Scott had somehow engaged his truck to lunge forward as though he was attempting to run down defendant. The court also found it "rather odd" that defendant, who protected people as a firefighter, situated himself in front of a 30,000-pound vehicle driven by someone he believed was extraordinarily aggressive. The court stated, "I believe that the self-defense has not in fact been established here, that the State has overcome its burden."

¶ 36     The trial court concluded that the State failed to prove that defendant intended to kill Scott, and consequently, found defendant not guilty of the two counts of attempted first degree murder. The court further concluded that defendant was guilty of aggravated discharge of a firearm, and that he was not acting in self-defense.

¶ 37   Defendant filed a motion for a new trial arguing, *inter alia*, that the trial court erred when it found him guilty of aggravated discharge of a firearm because there was credible evidence that he acted in self-defense that was not rebutted by the State. At the hearing on the motion, defense counsel argued that Scott, Mostyn, and Johnson substantially impeached themselves and that their testimony was inconsistent and contradictory. The trial court stated, "I don't believe there was credible evidence of self-defense." The court noted that defendant's testimony was the only evidence of self-defense and stated, "quite frankly, his testimony was not credible." The court further found that defendant's testimony was rebutted by Scott, who was "an extraordinarily credible man." The court pointed out that none of the State's witnesses testified that Scott used his truck in an aggressive manner that would have placed defendant in reasonable fear that he was in danger of any kind of bodily harm. The court stated that if there had been any credible evidence that Scott had lurched his truck towards defendant, it would have found defendant not guilty. The court further stated, "I don't believe the evidence supported that that's what happened here." Accordingly, the trial court denied defendant's posttrial motion.

¶ 38   Prior to sentencing, defendant filed a 15-page "Sentencing Memorandum" arguing that he should be sentenced to probation because it would appropriately and adequately account for all the mitigating factors, and a term of imprisonment would place too much emphasis on the aggravating factors. At the sentencing hearing, in aggravation, the State argued that, although defendant had no criminal history, his actions were extremely dangerous, he threatened the safety of Scott and all the people in the area, and he was a danger to the public. Scott read a victim impact statement explaining that his life will never be the same, that he relives the horror of the shooting every time he drives in that area, and that he repeatedly replays the shooting in his head.

¶ 39    Defendant called several witnesses in mitigation. Chicago firefighter Marlo Garner testified that he had known defendant for 15 years, that defendant would always help people, and that he would not harm anyone. Retired Chicago police officer Arlene Tankson testified that she had known defendant for 10 years from working security with him at the children's group home. Defendant was always outgoing and helped people, including her son and the children at the group home, and he had never done anything to hurt anybody. Kenneth Orr, defendant's stepbrother, testified that he had known defendant for 30 years, defendant always encouraged and protected him, and that defendant could help more people if he was not imprisoned. Defendant's 19-year-old daughter testified that defendant raised her and was always there for her. His 12-year-old son testified that defendant was a great influence on him and always motivated him to do better. Victoria Woods, his 12-year-old son's mother, testified that defendant was an anchor in their lives who provided structure and helped them tremendously. Defendant's mother, Laura Swafford, testified that defendant was an extremely hard-working and self-sacrificing person who risked his life for others. He was a very good father who had a passion for sports and was friends with upstanding people who also loved sports.

¶ 40    In mitigation, defense counsel argued that sending defendant to prison would be devastating to his family, friends, and the community. Counsel noted that 25 letters of support were attached to defendant's sentencing memorandum. Counsel argued that defendant devoted his life to the city and helping others. Counsel pointed out that defendant had never been arrested and did not associate with criminals. Counsel further argued that defendant worked security at Aunt Martha's because it was a place where children were in need, and defendant went out of his way to help those children and his community. Counsel argued that having a felony conviction on his

record was enough punishment for defendant, who could no longer work as a firefighter or possess a weapon. Counsel asked that defendant be sentenced to probation rather than prison.

¶ 41   In allocution, defendant stated that he was a great man of great integrity who proudly served his city. He stated that he went above and beyond what was required of a person as a father, son, and boyfriend, and went out of his way to help anyone. Defendant stated that he was more of a good person than bad person, and the "unfortunate situation" that occurred was not a reflection of who he was. He stated that he was a caring person who loved people and would not hurt anyone. He further stated that if there were more people in the city like himself, it would be a better place. Defendant thanked his attorneys, the court, and those who supported him, and asked the court for leniency.

¶ 42   The trial court stated that it had to consider the appropriate factors in aggravation and mitigation. The court noted that there was "an extraordinary amount of mitigating evidence" that was heartfelt and sincere. The court stated that it considered defendant's statement in allocution, which was also heartfelt. It noted that defendant's sentencing memorandum included numerous attachments which demonstrated the support of the community, and went above and beyond the fact that he helped citizens and placed himself in danger as a firefighter. The court stated that the aggravated discharge conviction was a Class 1 felony with a sentencing range of 4 to 15 years' imprisonment, but was also a probationable offense. The court stated that it considered the mitigating factor that defendant's conduct did not cause physical harm to Scott, however, it threatened physical harm to him. The court surmised that defendant's actions were the result of road rage. The court pointed out that defendant did not fire one shot at an occupied vehicle, as the statute required, but instead, fired multiple shots, all of which entered the front windows of the cab

of the truck. The court surmised that the upward angle of the gunfire saved Scott from suffering injuries. The court stated that defendant was "way too intelligent of a man not to have contemplated that his actions didn't create a serious threat of physical harm to another person." The court found that there was no provocation by Scott that justified defendant's actions. The court stated that defendant's actions created such a serious threat of harm to another individual that the sentence had to be designed to deter others from committing the same kind of offense. The court concluded:

"I think to sentence the defendant to probation even taking everything into consideration in mitigation and aggravation which I believe I have would, in fact, deprecate the seriousness of the offense and of Mr. Wilks' conduct here. I don't get any enjoyment out of it. I know it's going to have a great affect [*sic*] on a lot of other people, but I have to do my job. And in this particular case I believe that the appropriate sentence is a term of imprisonment of four years followed up with two years mandatory supervised release. That is the minimum sentence that I can impose to the Department of Corrections, but I do not believe probation is appropriate in this particular case."

¶ 43     Defendant filed a motion to reconsider his sentence. At the hearing on that motion, defense counsel argued that the four-year prison sentence was excessively harsh where defendant had no criminal background, was never arrested, lived an exemplary life, and was a role model for his family and community. Counsel claimed that the court failed to consider all the mitigating factors. Counsel further argued that it was not possible for defendant to engage in similar conduct again because he no longer had a FOID card or CCL, and thus, was no longer permitted to carry a gun. Counsel argued that if the court believed imprisonment was necessary, it should impose "jail time less than four years" followed by a term of probation. The State responded that the court considered

all the factors in aggravation and mitigation, that there was an extreme public safety issue with defendant's actions, and that the four-year term was appropriate.

¶ 44    The trial court pointed out that it had sentenced defendant to the minimum prison term for the offense. The court emphasized that defendant drove in a reckless manner to catch up to the truck, exited his vehicle, walked to the front of the truck, fired multiple gunshots into the windshield knowing someone was inside, and fired at least one more gunshot into the side window of the cab of the truck. The court stated that the multiple gunshots fired into the window where the driver was sitting demonstrated the serious nature of the offense, which was taken into consideration. The court further stated:

> "The argument that this is impossible and will never happen again, because he lost his FOID card, he lost his CCL. I got four hundred dollars [*sic*] hundred cases on my call. A lot of them are gun cases. Ninety-nine percent of the gun cases nobody has a FOID card, nobody has a concealed carry card. So, to say that Mr. Wilks couldn't ever possibly commit a crime again because he's not going to get that indicia of permission to exercise the second amendment rights is not an argument that I think is persuasive or convincing."

The court stated that defendant was given an "extraordinary amount of consideration" throughout the entire process. The court further stated that it was impressed with the love and respect expressed by defendant's family and friends, and took that into consideration. The court stated, "I think to place him on probation really would have deprecated the seriousness of what he did. Multiple shots. Knowing somebody is driving that truck. Those things matter to me." The court also noted that defendant did not wait for the police to arrive and left the scene. The court stated

that the minimum prison term was based on the mitigating evidence and was appropriate. Accordingly, the trial court denied defendant's motion to reconsider his sentence.

¶ 45    On appeal, defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because it failed to prove that he did not act in self-defense where his testimony was credible and unimpeached while the State's witnesses gave conflicting testimony that was impeached. Defendant argues that he credibly testified that the truck lunged forward at him, that he was scared for his life, and that he fired two to three shots at the truck while trying to save his life. Defendant claims that the State did not rebut his unimpeached testimony. He further claims that the testimony from Mostyn and Johnson regarding when and where he drew his weapon was impeached and contradicted by each other's testimony and that of defendant and Scott. Defendant notes that the trial court rejected Mostyn's testimony that he fired shots at the back of the truck. He further asserts that Johnson's testimony that she heard gunshots, looked up and observed a man returning to a vehicle was impeached with her 911 call in which she stated that she observed the shooter exit and stand at the side of his vehicle.

¶ 46    The State responded that the evidence established that defendant was not acting in self-defense where the trial court found Scott's testimony credible and defendant's testimony not credible. The State argues that defendant failed to satisfy any of the six factors required to demonstrate that he was acting in self-defense because the court found his testimony not credible. The State further argues that it rebutted defendant's claim of self-defense with Scott's credible testimony, which the court found was at least partially corroborated by the testimony from Mostyn and Johnson.

¶ 47     To prove defendant guilty of aggravated discharge of a firearm as charged in this case, the State was required to show that defendant knowingly discharged a firearm in the direction of a vehicle which he knew or should have known was occupied by a person, namely, Scott. 720 ILCS 5/24-1.2(a)(2) (West 2016). Self-defense is an affirmative defense, and when raised by defendant, it is the State's burden to prove beyond a reasonable doubt that defendant did not act in self-defense, in addition to proving the elements of the offense. *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 48     The self-defense statute provides that a person is justified in using force against another when and to the extent he reasonably believes such conduct is necessary to defend himself against the other person's imminent use of unlawful force. 720 ILCS 5/7-1(a) (West 2016). The statute further provides that a person is justified in the use of force that is intended or likely to cause death or great bodily harm only if he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another. 720 ILCS 5/7-1(a) (West 2016).

¶ 49     When a defendant claims that he acted in self-defense, he must present some evidence of each of the following elements: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that there was an imminent danger of harm; (4) that his use of force was necessary; (5) that he actually and subjectively believed a danger existed that required the force applied; and (6) that his beliefs were objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50; *People v. Lee*, 213 Ill. 2d 218, 225 (2004). "If a defendant presents 'some evidence as to each of these elements,' the burden shifts to the State to disprove the defense beyond a reasonable doubt." *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 33 (quoting *People v. Willis*, 217 Ill. App. 3d 909, 917 (1991)). If the State negates any one of these elements, defendant's claim of self-defense must fail. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 225.

¶ 50    On review, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense. *Gray*, 2017 IL 120958, ¶ 51. Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 51    The testimony of a single witness is sufficient to sustain a conviction where it is positive and credible, even when it is contradicted by defendant. *Gray*, 2017 IL 120958, ¶ 36. A conviction will not be reversed simply because the evidence was contradictory, or defendant claims a witness was not credible. *Gray*, 2017 IL 120958, ¶ 36. "[C]ontradictory testimony does not necessarily destroy the credibility of a witness." *Gray*, 2017 IL 120958, ¶ 47. It is the duty of the factfinder to determine if and when the witness testified truthfully, and how flaws in part of the testimony affected the credibility of the whole testimony. *Gray*, 2017 IL 120958, ¶ 47.

¶ 52    Here, viewed in the light most favorable to the State, we find that the evidence supported the trial court's finding that defendant did not act in self-defense. Scott testified that defendant would not allow him to merge his truck into heavy traffic as he attempted to exit the interstate. Scott eventually exited, and while stopped on the ramp at a red light, he observed defendant driving up the ramp on his left side. Defendant exited his vehicle and walked to the front of Scott's truck. While standing directly in front of the truck, defendant drew a handgun, pointed it at Scott, and fired about five gunshots into Scott's windshield. Scott pressed on his accelerator, and as his truck moved forward, defendant walked to the passenger side of the truck and fired more gunshots,

shattering the passenger window. Scott testified that defendant did not say anything to him or make any gestures towards him before he began shooting. The State corroborated Scott's testimony with photographs depicting five bullets holes in the windshield of Scott's truck and his shattered passenger-side window. The State also presented Scott's 911 call in which Scott reported that the driver of a Lexus would not allow him to exit the expressway, followed him up the exit ramp, "jumped" out of his vehicle and fired gunshots at him. Scott told the 911 operator "he shot my windshield, he shot my side window out, he's trying to kill me."

¶ 53    In addition to Scott's testimony, Mostyn testified that she observed a man exit a vehicle, leaving his door open, and fire multiple gunshots at a truck. Mostyn testified that the gunman fired once at the back of the truck and "a few more times" into the passenger-side window. Mostyn's testimony was corroborated with her 911 call in which she reported that she observed a man exit his vehicle and fire three or four gunshots at a truck. Furthermore, Johnson testified that she observed a silver vehicle, later identified as defendant's vehicle, cut across several lanes of traffic at the last minute to exit the interstate. Johnson testified that she "kept an eye on the car because of the aggressive driving." While stopped in traffic on the exit ramp, Johnson heard several gunshots in front of her, looked up, and observed a gunman firing a weapon towards the south lane of traffic. The gunman then returned to the open door of the silver vehicle. In her 911 call, Johnson reported that the gunman had "cut in front of a bunch of people to get off on the exit and then he got out of his car and he shot I think about four or five shots" towards the south lane of traffic. The State also presented defendant's 911 call in which he reported that a truck had sideswiped his vehicle on the interstate, they both exited the expressway, and defendant "cut him off" and drove

in front of the truck. Defendant stated that the truck tried to run over him and he shot through the driver's window.

¶ 54    The trial court specifically found that Scott's testimony was credible and that Mostyn and Johnson had also observed the shooting. The court further found that defendant's testimony, including his claims that his vehicle was damaged by the truck and that Scott lunged the truck at him as though he was attempting to run over defendant, was "completely uncorroborated." The court found that this was a case of "road rage" and concluded that "self-defense has not in fact been established here, that the State has overcome its burden." When denying defendant's motion for a new trial, the court expressly stated that defendant's testimony had been rebutted by Scott, who was "an extraordinarily credible man." The court noted that defendant's testimony was the only evidence of self-defense and stated, "quite frankly, his testimony was not credible."

¶ 55    The record therefore reveals that the trial court determined that the testimony from the State's witnesses established that Scott did not threaten unlawful force against defendant, that defendant was the aggressor, that defendant was not in danger of imminent harm, that his use of force against Scott was not necessary, that defendant did not actually and subjectively believe that a danger existed that required the force he applied, and that defendant's alleged belief that he was facing harm from Scott was not objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50. By negating all the elements, the State proved beyond a reasonable doubt that defendant did not act in self-defense.

¶ 56    In reaching this conclusion, we find no merit in defendant's argument that his testimony regarding his version of the events was credible and unrebutted by the State's witnesses, who gave conflicting testimony that was impeached. The determination of the credibility of defendant's

testimony and the resolution of any conflicts in the evidence was within the province of the trial court, which expressly found defendant's testimony uncorroborated and not credible. *Siguenza-Brito*, 235 Ill. 2d at 228. The record further shows that the court acknowledged the contradictions in the versions given by the State's witnesses, but found they were "explainable given the extraordinary circumstances that they had just observed." The trial court specifically found that, although Mostyn's testimony could not be "accepted in totality" where a portion of it was contradicted by the fact that she did not report to Murtaugh or the 911 operator that the gunman fired the first shot at the rear of the truck, that did not mean she was "lying" or that everything she said had to be dismissed. It was the trial court's duty to determine how the contradictions affected the credibility of each witness' entire testimony. *Gray*, 2017 IL 120958, ¶ 47. Based on this record, we find no reason to disturb the trial court's credibility determinations. *Gray*, 2017 IL 120958, ¶ 36.

¶ 57     Defendant next contends that the trial court abused its discretion when it denied his request for probation and sentenced him to prison. Defendant argues that the court failed to consider his mitigating evidence, including his lack of criminal history and his large amount of family and community support, which showed he had great potential for rehabilitation. He further argues that the court gave improper consideration to other firearm cases when it commented that revoking defendant's FOID card and CCL did not indicate that he would not commit a firearm violation in the future where the court had 400 cases on its call, and in 99% of the gun cases the defendants did not have FOID cards or CCLs. In addition, defendant claims the court improperly considered a factor inherent in the offense as an aggravating factor when it considered that he fired the gunshots into the cab of the truck where the truck driver was seated.

¶ 58    The State responds that the court's rejection of probation was proper where it expressly found that sentencing defendant to probation would deprecate the seriousness of the offense in this case. The State points out that defendant received the minimum prison term available. The State argues that the trial court stated that it considered defendant's mitigating evidence but found that it was outweighed by the seriousness of the offense. The State further argues that the court did not give improper consideration to other firearm cases, but instead, made the challenged comment in direct response to defendant's argument that it would be impossible for him to commit another firearm offense because he no longer had a FOID card or CCL, and explained why it found that argument unpersuasive. In addition, the State argues that the court did not give improper consideration to a factor inherent in the offense, but rather, properly considered the nature and circumstances of the offense in this case.

¶ 59    The aggravated discharge of a firearm offense in this case is a Class 1 felony with a statutory sentencing range of 4 to 15 years' imprisonment. 720 ILCS 5/24-1.2(a)(2), (b) (West 2016); 730 ILCS 5/5-4.5-30(a) (West 2016). The trial court may impose a sentence of probation for the offense unless, giving regard to the nature and circumstances of the offense and the history, character and condition of the defendant, it finds that probation would deprecate the seriousness of the defendant's conduct and would be inconsistent with the ends of justice. 730 ILCS 5/5-4.5-30(d) (West 2016); 730 ILCS 5/5-6-1(a)(2) (West 2016). The trial court has broad discretion in imposing an appropriate sentence, and where, as here, that sentence falls within the statutory range, it will not be disturbed on review absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion exists where a sentence is at great variance with the spirit

and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 60    The Illinois Constitution mandates that criminal penalties be determined according to the seriousness of the offense, and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Ligon*, 2016 IL 118023, ¶ 10. In light of these objectives, "[t]he trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, including the nature of the offense and the character of the defendant." *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The court's sentencing decision is entitled to great deference because, having observed the defendant and the proceedings, it had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age. *Alexander*, 239 Ill. 2d at 213. "The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " *Fern*, 189 Ill. 2d at 55 (quoting *People v. Barrow*, 133 Ill. 2d 226, 281 (1989)). The trial court need not give defendant's potential for rehabilitation greater weight than the seriousness of the offense. *People v. Anderson*, 325 Ill. App. 3d 624, 637 (2001).

¶ 61    Here, we find no abuse of discretion by the trial court in denying defendant's request for probation and sentencing him to a term of four years' imprisonment, the minimum term in the statutory range. *Jones*, 168 Ill. 2d at 373-74. The record shows that in imposing the sentence, the trial court stated that it considered the appropriate factors in aggravation and mitigation. The court expressly noted that there was "an extraordinary amount of mitigating evidence" which it found heartfelt and sincere. The court further noted that defendant's sentencing memorandum included

numerous attachments which demonstrated the support of the community and went above and beyond the fact that he helped citizens and placed himself in danger as a firefighter. The court also stated that it considered defendant's statement in allocution, which it also found heartfelt. In addition, the court stated that it considered the mitigating factor that defendant's conduct did not cause physical harm to Scott; however, it found that his conduct threatened physical harm to him. The court pointed out that defendant did not fire one shot at an occupied vehicle, as required by the statute, but instead, fired multiple gunshots into the front widows of the cab of the truck. The court noted that there had been no provocation by Scott that justified defendant's actions. The court stated that defendant's actions created such a serious threat of harm to Scott that the sentence had to be designed to deter others from committing similar offenses. The record thus reveals that, contrary to defendant's claim, the trial court gave significant consideration to his mitigating evidence and potential for rehabilitation but determined that it was greatly outweighed by the seriousness of the offense in this case. *Anderson*, 325 Ill. App. 3d at 637.

¶ 62    Moreover, the record shows that after considering all of the above factors, the trial court determined that probation would not be an appropriate sentence in this case. The court found that defendant's actions were the result of road rage. The trial court stated, "I think to sentence the defendant to probation even taking everything into consideration in mitigation and aggravation which I believe I have would, in fact, deprecate the seriousness of the offense and of Mr. Wilks' conduct here." The court concluded "I do not believe probation is appropriate in this particular case." In denying defendant's motion to reconsider the sentence, the court again explained "I think to place him on probation really would have deprecated the seriousness of what he did. Multiple shots. Knowing somebody is driving that truck. Those things matter to me." The record thus shows

that, after considering the nature and circumstances of the offense, the court determined that a sentence of probation was inappropriate because it would deprecate the seriousness of defendant's conduct. See 730 ILCS 5/5-6-1(a)(2) (West 2016). The court's finding was made in accordance with the statute, and we find no basis to disturb the sentence.

¶ 63    Furthermore, we find no merit in defendant's argument that the court gave improper consideration to other firearm cases when it commented that revoking defendant's FOID card and CCL did not indicate that he would not commit a firearm violation in the future where the court had 400 cases on its call, and in 99% of the gun cases the defendants did not have FOID cards or CCLs. The record shows that this comment was not made during the sentencing hearing when the court was determining the appropriate sentence, but instead, was made a month after the sentence had been imposed when the court denied defendant's motion to reconsider his sentence. The record further shows that this comment was made in direct response to defense counsel's argument that it was not possible for defendant to engage in similar conduct in the future because he no longer had a FOID card or CCL, and thus, was no longer permitted to carry a gun. Consequently, we find that the challenged comment was not improper and was not a factor in the court's sentencing determination.

¶ 64    Similarly, we find no merit in defendant's argument that the court improperly considered a factor inherent in the offense as an aggravating factor when it considered that he fired the gunshots into the cab of the truck where the truck driver was seated. The trial court is generally prohibited from considering a factor implicit in the offense as an aggravating factor at sentencing. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). In other words, one factor cannot be used as both an element of the offense, and as a basis for imposing a sentence that is harsher than what might

otherwise have been imposed. *Phelps*, 211 Ill. 2d at 11-12. The court, however, may consider the nature of the offense when imposing a sentence, including the circumstances and extent of each element as committed. *People v. Robinson*, 391 Ill. App. 3d 822, 842 (2009).

¶ 65    Here, the elements of the offense that the State had to prove to find defendant guilty were that he knowingly discharged a firearm in the direction of a vehicle that he knew or should have known was occupied by a person. 720 ILCS 5/24-1.2(a)(2) (West 2016). At sentencing, the trial court pointed out that defendant did not fire one shot in the direction of an occupied vehicle, as the statute required, but instead, fired multiple gunshots directly into the front windows of the cab of the truck where he knew the driver was sitting. The record thereby shows that the trial court did not consider a factor implicit in the offense as an aggravating factor, but rather, properly considered the nature and circumstances of defendant's actions in this case and determined that a term of imprisonment rather than probation was appropriate.

¶ 66    This court will not reweigh the sentencing factors or substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 213. Based on the record before us, we cannot say that the sentence imposed by the court is excessive, manifestly disproportionate to the nature of the offense, or that it departs significantly from the intent and purpose of the law. *Fern*, 189 Ill. 2d at 56. Accordingly, we find no basis to disturb the trial court's judgment.

¶ 67    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 68    Affirmed.